**LITTLE CAESAR ENTERPRISES, INC., Plaintiff,**

**v.**

**Gary G. SMITH, et al., Defendants.**

**Gary G. Smith, et al., Plaintiffs,**

**v.**

**Little Caesar Enterprises, Inc., Defendant.**

**CIV.A.Nos. 93–40520, 93–40521.**

United States District Court, E.D. Michigan, Southern Division.

Sept. 30, 1998.

---

Shawn M. Perry, Perry, Perry, and Perry, Richard A. Lockridge, Lockridge, Grindal, Nauen & Holstein P.L.L.P., Minneapolis, MN, Charles A. Turnbull, O'Reilly, Rancilio, Nitz, Andrews & Turnbull, P.C., Sterling Heights, for Plaintiffs.

Irwin Alterman, Kemp, Klein, Umphrey & Endelman, Troy, Alan C. Harnisch, Harnisch & Hohauser, P.C., Bingham Farms, Stephen D. Susman, Susman Godfrey, L.L.P., Houston, TX, for Defendants.

*ORDER IN CASE NUMBER 93–40521 ACCEPTING (1) REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE PEPE ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (III); (2) REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE PEPE ON PLAINTIFFS' MOTION TO AMEND THIS COURT'S AUGUST 7, 1995 ORDER; and (3) REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE PEPE ON PLAINTIFFS' MOTION TO AMEND THE MARCH 31, 1997, CLASS CERTIFICATION ORDER*

GADOLA, District Judge.

Before the court are three separate reports and recommendations filed on March 31, 1998 by Magistrate Judge Steven D. Pepe. All three reports concern motions in case number 93–40521, in which plaintiffs are a class of approximately 400 franchisees of defendant, Little Caesar Enterprises, Inc. ("LCE"). This court, pursuant to 28 U.S.C. § 636(b)(1)(B), Fed.R.Civ.P. 72(b), and L.R. 72.1(d)(2) (E.D.Mich. Jan. 1, 1992), has conducted an extensive review of each report and recommendation, as well as the objections and responses submitted by the parties and the authority cited both by the parties and by the magistrate judge. After conducting a *de novo* review, the court accepts each report and recommendation as the court's findings and conclusions.

While the exhaustive analysis of the magistrate judge obviates the need for a further recitation of the facts and legal issues implicated in the instant motions, this court does wish to specifically address one objection filed by plaintiffs to the report and recommendation on defendant's motion for partial summary judgment (III). The lynchpin of the magistrate judge's recommendation that defendant's motion for summary judgment be granted as to the issue of market power in the tying market is the magistrate judge's conclusion that the plaintiffs are not entitled to a narrowed market definition of the type discussed in *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), and its progeny. In turn, the key to that conclusion was the magistrate judge's finding that "the evidence does not show that during the limitations period for this lawsuit the defendant used its restrictive policy on the availability of logoed goods to alternate distributors to *exclude* any potential distributor from the market. Nor during the limitations period has any potential alternate distributor been *precluded from entering* the market to compete with Blue Line because of LCE's restriction on the availability of logoed goods." (Rep. & Rec. at 100(emphasis in original).)

Plaintiffs' primary contention with respect to the substance of this analysis is that the magistrate judge relied on an incorrect reading of the Sixth Circuit's decision in *PSI Repair Servs., Inc. v. Honeywell, Inc.,* 104 F.3d 811 (6th Cir.1997). Plaintiffs contend that the *PSI* court would have allowed a *Kodak*-type market definition to be submitted to a jury in that case if the antitrust plaintiff had submitted substantial evidence that the defendant had *either* changed its pricing structure and service policies after locking the plaintiff in *or* merely concealed material information prior to sale about its pricing structure and service policies. Accordingly, plaintiffs in this case contend that the magistrate judge erred when he read *PSI* and *Kodak* as requiring plaintiffs to produce evidence that LCE actually implemented its policy to exclude any potential

alternate distributor from the market. Under plaintiffs' reading of *PSI*, the fact that the magistrate judge found that there was substantial evidence that LCE concealed information related to the ability of alternate distributors to compete without access to logoed goods is sufficient, in and of itself, to justify a narrowed market definition under *Kodak*.

However, this court agrees with the magistrate judge's interpretation of the holding of the *PSI* court. In *PSI*, the court held specifically that:

> [i]f there were any evidence in the record that Honeywell *took advantage of its customers' imperfect information* in order to reap supracompetitive profits in the aftermarkets for its equipment, we would not hesitate to allow a *Kodak*-type theory to be submitted to the jury. However, we can find nothing in the record or PSI's brief that alleges that Honeywell engaged in such activities.

*PSI*, 104 F.3d at 821 (emphasis added). This language seems to imply that an antitrust plaintiff must show that the defendant took some action in an attempt to capitalize on the antitrust plaintiff's imperfect information after the plaintiff became locked in relying on that imperfect information. Accordingly, this court agrees with the magistrate judge's conclusion that one requirement for a narrowed market definition under *Kodak* and *PSI* is that plaintiff must show that, "after a substantial number of customers have sunk significant costs that are not recoverable and face other switching costs, the seller takes some action changing its policy (or acting on a prior undisclosed policy) that takes advantage of its locked in customers' lack of information in order 'to reap supracompetitive profits' by imposing a burdensome tie-in." (Rep. & Rec. at 50.) Moreover, this court agrees with the conclusion of the magistrate judge that, in this case, "no reasonable jury could find that during the limitations period LCE used its power to deny access to logoed goods to alternate distributors to handicap or exclude any rival distributors." (Rep. & Rec. at 101.)

Accordingly, this court having reviewed the submissions of the parties and being fully advised in the premises,

It is hereby **ORDERED** that the magistrate judge's March 31, 1998 report and recommendation on defendant's motion for partial summary judgment (III) is **ADOPTED**.

It is further **ORDERED** that defendant's motion for partial summary judgment is **DENIED** on the issue of there being one product and not two, and **GRANTED** on the issue that plaintiffs have insufficient proof of market power in the tying product market.

It is further **ORDERED** that the magistrate judge's March 31, 1998 report and recommendation on plaintiffs' motion to amend this court's August 7, 1995 order is **ADOPTED**.

It is further **ORDERED** that plaintiffs' motion pursuant to Rule 54(b) is **DENIED**.

It is further **ORDERED** that the magistrate judge's March 31, 1998 report and recommendation on plaintiffs' motion to amend the March 31, 1997, class certification order is **ADOPTED**.

It is further **ORDERED** that plaintiffs' motion to amend the March 31, 1997, class certification order is **DENIED**.

**SO ORDERED.**

### *REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

PEPE, United States Magistrate Judge.

I. BACKGROUND FACTS . . . . . . . . . . . . . . 463
II. DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGEMENT . . . . . . . . 466
III. IS THE PURCHASE AND OPERATION OF A LCE FRANCHISE A SEPARATE PRODUCT FROM THE LOGOED PRODUCTS OR OTHER PRODUCTS NECESSARY TO OPERATE SUCH A FRANCHISE? . . . . . . . . . . . . . . . . . . . 467
 A. *Can A Franchise Be a Tying Product?* . . . . . . . . . . . . . . . 467
 B. *Are the Products Associated with a Franchise Trademark Separate From the Franchise Itself?* . . . . . . . . . . . . 468
IV. CAN THE CLASS PLAINTIFFS PROVE LCE HAS SUFFICIENT MARKET POWER IN THE TYING

PRODUCT MARKET TO INVOKE THE
*PER SE* RULE MAKING A TIE–IN
ILLEGAL? ...................... 470
 A. *Substantial Market Power in Tying Market After Fortner II and Jefferson Parish* ..................... 472
 B. *Kodak and Narrowed Market Definition* .......... 477
 C. *PSI Repair Services v. Honeywell, Inc.* ............. 482
 D. *Areeda, Hovenkamp and Elhauge on Kodak* .......... 486
 1. The *Kodak* Analysis ..... 486
 2. *Kodak* and Franchises ... 487
V. ANALYSIS ...................... 490
 A. *Facts Known to Franchisees Signing the mid–1990 Franchise Agreement* ........ 490
 B. *Other Facts Relevant to* Kodak *Lock-in Market* ....... 492
 C. *Testimony of Plaintiffs' Experts* .................... 500
 D. *Legal and Factual Analysis and Conclusion* .......... 505
V. RECOMMENDATION ............... 513

Defendant Little Caesar Enterprises, Inc. ("LCE") has filed a motion for partial summary judgment which has been referred for Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).[1]

## I. BACKGROUND FACTS:

The current motion involves only the antitrust tie-in class certified by this Court in its March 31, 1997, order. *Little Caesar Enterprises, Inc. v. Smith*, 172 F.R.D. 236 (E.D.Mich.1997). Plaintiffs are approximately 400 franchisees of LCE throughout most of the nation who own and operate carry-out-only Little Caesar restaurant franchises under a mid–1990 Franchise Agreement. These franchisees purchase their supplies

needed to operate from Blue Line Distributing, Inc. ("Blue Line"), formerly a wholly owned subsidiary that has now merged with LCE. The class plaintiffs seek damages, declaratory and injunctive relief for alleged antitrust tie-in violations by defendant. During the relevant class period, Blue Line, in areas where it had a warehouse, sold to LCE franchises virtually all goods necessary to operate their Little Caesar restaurants.[2]

Little Caesar was founded in Michigan in 1959 by Michael Ilitch, who began to franchise his "Little Caesar" restaurants in 1962. As noted in this Court's earlier opinion, as of June 1, 1995, there were 536 franchisees nationwide operating 2,867 carryout-type restaurants. *Little Caesar Enterprises, Inc. v. Smith*, 895 F.Supp. 884, 887 (E.D.Mich.1995). The majority of these are class plaintiffs. LCE also has over 1,000 company-owned outlets comprising approximately 25% of the carryout units and over 500 Little Caesar restaurants in Kmart stores. Blue Line purchases all of the items used in Little Caesar restaurants from producers and suppliers and then re-sells them to LCE franchisees making a single delivery of the multiple goods. Most of these items are produced to meet LCE specifications. These items include foodstuffs, beverage products, sign equipment, paper products, salad dressing, other condiments with LCE's proprietary symbols and marks, and other items. Blue Line initially had only one warehouse in Farmington Hills, Michigan, and thus was limited in the number of midwestern franchisees to whom it could distribute goods. Other associate distributors, not affiliated with defendant, were approved by LCE in various

---

1. This case is consolidated. Because the class certified by this Court involves an antitrust claim (case No. 93–CV–40521) by class representative Gary Smith against LCE, this Report and Recommendation refers to the class members as plaintiffs and LCE as defendant. Gary Smith's claim was initially brought against three defendants, LCE, Blue Line Distributing, Inc. ("Blue Line"), and Little Caesar National Advertising Program, Inc. ("LCNAP"). Only LCE and Blue Line are accused defendants on the claimes involved in this motion. After this suit was filed, LCE merged with Blue Line. Thus, LCE is the sole remaining defendant for purposes of this motion. Thus, this Report refers only to a single defendant. Case No. 93–CV–40521 was filed by Gary

Smith along with two other franchisees, John Hennessy and Sharon Fields. This Court has granted summary judgment against Hennessy and Fields, although they have filed a motion for reconsideration of that ruling and an expanded class of plaintiffs. *Little Caesar Enterprises, Inc. v. Smith*, 895 F.Supp. 884, 894–898 (E.D.Mich. 1995). In a separate Report and Recommendation, I recommend that motion be denied.

2. In September 1989, Blue Line had warehouses serving eight regions of the United States. By December 1992, it operated warehouses serving Little Caesar franchises in 16 regions covering most of the United States.

regions throughout the country to service its other franchisees and LCE's company owned carryout facilities.

In the middle 1980's, Blue Line began to expand the number of its distribution warehouses throughout the country. LCE replaced the other associate distributors with its Blue Line distribution warehouses. By August 1989, defendant had eliminated the majority of third party distributors servicing Little Caesar franchisees and thereafter eliminated virtually all of the remaining distributors in the continental United States, except for two remote areas in Idaho that were not economically feasible for Blue Line to service.

Plaintiffs accuse defendant of unlawfully tying sales of the above-noted goods from Blue Line to the sale and continued operation of the Little Caesar franchises. They allege that the defendant LCE has used its inherent monopoly power derived from its copyrights, trademark, service names, and trade names to impose contractual and other uniform restrictions on the distribution of the various goods to franchisees, thereby eliminating the possibility of renewed competition with Blue Line by other food distributors.

Plaintiffs also allege that because LCE franchisees have invested substantial funds and effort in their restaurants and goodwill, and have signed long-term franchise agreements with a continuing two year non-compete clause in the pizza, pasta and submarine sandwich markets, they are effectively "locked in" to the LCE franchise system. Section VII of the relevant mid–1990 Franchise Agreement specifically grants franchisees the right to purchase supplies, including logoed goods (but excluding proprietary spice and dough mixes) from "any source of its choosing ... previously approved as a suppli-

er by LITTLE CAESAR." While the franchise agreements provide to each franchisee the right to request that LCE approve an alternate supplier of products made to LCE specifications, the mid–1990 Franchise Agreement[3]—unlike earlier franchise agreements and the more recent 1995 Franchise Agreement—excluded logoed goods needed to operate a Little Caesar franchise.[4]

LCE in June 1989 entered into a licensing agreement that gave Blue Line the exclusive right to distribute logoed products to franchisees. This Court has determined that the "logoed products" involved in this 1989 Licensing Agreement as well as in the mid–1990 Franchise Agreement applied only to those items bearing the Little Caesar registered mark, which a Little Caesar franchise provides its customers in the sale of its food products. These include items such as logoed paper products (bags, cups, napkins), packaging, and condiments such as salad dressing. 895 F.Supp. at 890–92. Defendant asserts that these logoed products comprise only about 6% of the food products and other items sold by Blue Line to a franchisee and needed to operate a franchise. While plaintiffs dispute these figures, they offer no substantial counter proofs. For purposes of this motion the logoed products will be considered less than 10% of the entire "market basket" of goods a franchisee needs to purchase in order to operate a Little Caesar carryout restaurant. Plaintiffs contend that because the profit margin for a distributor on logoed products is greater than other items, and because of the preference of many franchisees to obtain all their needed supplies from one source, other potential distributors cannot effectively compete with Blue Line if they are not given access to these logoed products.[5]

---

**3.** The term "Franchise Agreement" or "mid–1990–Franchise Agreement" as used throughout this Report refers to the August 1990 form franchise agreement as distinguished from the "pre–mid–1990 Franchise Agreement" or the 1995 Franchise Agreement.

**4.** All of the agreements before and after 1990 also precluded a request for an alternate source of signage, which practice, like the proprietary spice and dough mixes, is not challenged in this litigation.

**5.** In the present case, plaintiffs have not specifically alleged that Blue Line is charging "supracompetitive prices" on the logoed goods, but rather on the blended profit margin on the entire market basket of goods Blue Line sells. Defense counsel at a hearing on a related motion asserted, without challenge from plaintiffs, that plaintiffs are not charging, and could not prove that Blue Line is charging, above market prices for the logoed goods.

This 1989 Exclusive Licensing Agreement with Blue Line was not initially disclosed to the franchisees and only came to light several years later. Franchisees renewing their franchises on existing outlets [6] or those entering into franchises for a new outlet after the middle of 1990, would sign the Franchise Agreement that contained the restrictive language not permitting them to seek an alternate source of logoed products. Because the evidence would support such a finding and because disputed issues on a motion for summary judgment must be resolved in favor of the non-moving party, this Report will assume none of those franchisees who signed the mid–1990 Franchise Agreement were aware of the June 1989 Exclusive Licensing Agreement between LCE and Blue Line before signing the mid–1990 Franchise Agreement.

The logoed products are essential to the operation of a Little Caesar franchise and their usage is required. Under the Franchise Agreement plaintiffs contend that defendant is using this 1989 exclusive Blue Line licensing right on logoed paper, combined with the new 1990 contractual limits on franchisees seeking alternate distributors of logoed products, to preclude alternate sources of supply and competition on these logoed items. Plaintiffs assert that the defendant's denial of access to these logoed products is also intended to make it less profitable or more burdensome for alternate distributors of franchise supplies to enter the market.

Plaintiffs argue that the tying arrangement is not limited to logoed products. They assert that the practical economic effect of the exclusive licensing agreement for logoed products is to effect a tie-in of the entire "market basket" of goods needed to operate a Little Caesar franchise. Plaintiffs' experts also argue that the tied product is the market basket of goods, supplies and distribution services, not merely logoed products because "it is uneconomic to operate as a distributor without access to logoed products." Siwek and Nelson December 22, 1996, Declaration at ¶¶ 4–10.

Plaintiffs also contend that the forced tie-in of the entire "market basket" of goods is burdensome because Blue Line is charging supracompetitive prices. Because discovery on the pricing structure is not complete, this Report will accept the premise that plaintiffs by trial would have sufficient evidence to get to a jury on "supracompetitive" prices for the entire "market basket" of goods.

In addition to the arguments that franchisees in the class are forced to purchase the entire "market basket" of goods from Blue Line, because LCE/Blue Line uses the exclusive licensing agreement and the resulting market leverage over logoed goods to exclude rival distributors of the non-logoed items needed to operate a Little Caesar franchise, plaintiffs continue to accuse defendant of a pattern of wrongfully refusing requests for approval of alternative distributors other than Blue Line. Plaintiffs argue that until this litigation was commenced, it was "futile" for any franchisee to seek an alternate distributor to Blue Line because such a request would be denied. In its earlier opinion denying a nationwide class of franchisees, including those with pre–1990 Franchise Agreements, this Court granted summary judgment on the tying claims of plaintiffs Hennessy and Fields, and Gary Smith before April 1992, because they did not exercise their contract rights to request an alternate distributor to Blue Line, and because they could not prove they did not make such a request because they knew it would be futile to do so. Thus, in the absence of an express tying arrangement (or a defense admission) these plaintiffs could not prove they were "forced" or "coerced" to buy all goods from Blue Line as those terms are used in the antitrust cases to show there was an illegal tie. 895 F.Supp. at 894–96. Plaintiffs have filed a motion under Fed.R.Civ.P. 54(b) to reconsider that ruling, which is analyzed in a separate report and recommendation.

This case involves the certified class of franchisees who signed the mid–1990 Franchise Agreement that did not provide an

---

6. In 1990, the carryout franchises contract term was for 10 years with an option to renew under the then current franchise agreement terms.

The term of earlier franchise agreements that would need renewing in the 1990's is not identified in the record.

express contract right to seek an alternate supplier of logoed products.[7] That class was certified to determine whether there was an illegal tie between the continued operation of a Little Caesar franchise and the purchase of logoed products from Blue Line. This case also involves the plaintiffs' contention that the practical economic effects of the tying of logoed goods also tied in the purchase of the entire "market basket" of goods needed to operate a Little Caesar franchise by raising rival distributors' entry barriers and costs of operation.

This Report's analysis will involve both the question of (1) whether there were any refusals by LCE/Blue Line to allow potential rivals access to logoed goods and whether the refusal made it economically infeasible for rivals to enter the market to compete with Blue Line; and (2) whether the knowledge of the unavailability of logoed goods to alternate distributors dissuaded any distributor from considering seeking LCE approval to become an alternate distributor. Yet, this post–mid-1990 Franchise Agreement class was not certified to revisit the issue of whether LCE wrongfully refused to approve alternate distributors or the issue of whether it was futile and/or known to be futile for an alternate distributor to apply. That issue is addressed in the Report and Recommendation on plaintiffs' Rule 54(b) motion.

II. DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT:

LCE has moved for partial summary judgment, raising numerous issues. Because I recommend summary judgment be granted to defendant on an issue that involves the *per se* tying claims of all the class plaintiffs, this Court need only consider two of the issues.

First, LCE claims that the franchise agreement and the logo paper products that Blue Line sells are not separable and therefore are not products that can be tied together. For reasons stated below, these are two products that can be tied for antitrust purposes.

LCE's most forceful argument with respect to the tie-in class is that the plaintiffs cannot demonstrate that LCE has sufficient market power in the relevant tying market to appreciably restrain competition in the tied market. Defendant argues that the relevant tying market in the present case is the market for either carryout pizza franchises[8] or, alternatively, a larger market of all fast food franchises, and not the market comprised solely of Little Caesar franchises.[9] Defendant contends that it has no significant market power based on their market share of either of these markets.[10] Thus, plaintiffs

---

7. In reaching its decision denying certification of a class that included the pre–mid-1990 franchisees, the Court left open the question of whether there might be a "basis for certification of a national class action [involving] the franchise agreements signed after mid-1990 [that] prevent franchisees from requesting an alternate distributor of logoed products." *Id.* at 905. The Court noted: "It could be argued that the post-1990 agreements, combined with the 1989 exclusive licensing agreement, evidence an express contractual tie-in of logoed products which could receive class treatment." Thus, the Court did not grant summary judgment on the tie-in claim involving the mid–1990 Franchise Agreements. It was this class the Court later certified in its March 31, 1997, order. 172 F.R.D. at 239 and 268.

8. Defendant's Brief Supporting its Motion for Partial Summary Judgment at 6–7 asserts that "[t]he relevant market for a tie-in claim on logo products and on other products used by a pizza chain's franchisees is the 'pre contract' market for the sale of franchises for either take out pizza franchises, fast food franchises or restaurant franchises in general."

9. Of the pizza chains listed in the top 100 fast food chains, LCE has a market share below 20%. Def. Motion Ex. 2–3. Because of the many smaller carryout pizza outlets, LCE's market share of all pizza outlets would be smaller. LCE's market share of the top 100 fast food chains (including pizza and other carryout foods) is approximately 3.4%. *Id.*

10. *Jefferson Parish Hospital v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), found a 30% market share insufficient to show significant market power in the tying product market that is needed to invoke the *per se* rule against tying. In light of *Jefferson Parish*, LCE concludes that plaintiffs have failed to show that LCE has enough market power in a market of all fast food franchises or of pizza franchises to invoke the *per se* rule on tying. The plaintiffs' claim of a *per se* tie-in violation requires the tying market to be defined as the single-brand Little Caesar carryout franchises, as they and their economic experts have alleged it to be. While market power can be shown by factors other than market share—such as a unique product protected by a patent, copyright or trademark—plaintiffs have failed to

cannot prove a critical element necessary to prevail on their *per se* tie-in claim.

III. Is the Purchase and Operation of a LCE Franchise a Separate Product from the Logoed Products or Other Products Necessary to Operate Such a Franchise?

A. *Can a Franchise Be a Tying Product?*

■ In a subsequent motion, the defendant questions whether a franchise and its continued operation can be a tying "product." Many courts, without question, treat a franchise as such. As noted by the Seventh Circuit in *Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704, 722 (7th Cir.1979):

> The law is well-settled that a franchise license itself can be the tying product. In *Northern v. McGraw–Edison Co.,* 542 F.2d 1336, 1345 (8th Cir.1976), *[c]ert denied,* 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977), the court stated:
>
> > A franchise license constitutes a separate and distinct marketable item. The weight of judicial authority supports the proposition that if prospective franchisees are compelled to purchase equipment or other tied products in order to obtain the franchise and trademark, an illegal tying arrangement exists.
>
> *Accord, Milsen Co. v. Southland Corp.,* 454 F.2d 363 (7th Cir.1971); *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir.1971), *[c]ert denied,* 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972).

*See also, Wilson v. Mobil Oil Corp.,* 984 F.Supp. 450 (E.D.La.1997); *Collins v. International Dairy Queen, Inc.,* 168 F.R.D. 668 (M.D.Ga.1996).

*Grappone v. Subaru,* 858 F.2d 792, 797 (1st Cir.1988), notes that a product distribution dealership is a franchise when privately owned, and one dealer can operate multiple franchises from a single location.

The record shows that Subaru was but one of many automobile franchisors, and that Grappone itself held not only Subaru, but also AMC, Pontiac, Jeep, Toyota, and Peugeot franchises.

Professors Areeda, Hovenkamp and Elhauge cite *Chicken Delight* and *Krehl v. Baskin–Robbins Ice Cream Co.,* 664 F.2d 1348 (9th Cir.1982), to note that at least in the "business format" franchise where the franchisee makes the product or service sold to the public:

> The trademark has been deemed the standard tying product for many franchises where the typical tied product was the equipment or ingredients used by the franchisee to make the final product.

Areeda, et al., Antitrust Law (1996) at 14, ¶ 1733 (footnote omitted). The Areeda authors in considering when a single-brand tying market can be allowed under the *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), "lock-in" theory specifically use franchises and dealerships with their trademarks as examples of a potential tying product. Areeda at p. 139, ¶ 1740; pp. 145–48, ¶ 1740c2. Also, in discussing single-brand products such as machines that can be a tying product, the authors note: "[t]o simplify we will not say much more about franchisees or dealers in this subparagraph. Most of what is said about the machine buyer also applies to them." *Id.* at p. 155 n. 47, ¶ 1740.

Plaintiffs' expert economists have also provided their opinion and economic explanation why the continued right to operate a franchise is an economic commodity for which a market exists for economic and antitrust purposes. Siwek and Nelson Dec. 1997 Declaration.[11]

produce sufficient evidence that LCE has significant market power derived solely from its trademark or copyrighted products bearing its trademark, logo and other distinctive marks. *Mozart Co. v. Mercedes–Benz of North America, Inc.,* 833 F.2d 1342, 1346–47 (9th Cir.1987); *A.I. Root Co. v. Computer Dynamics, Inc.,* 806 F.2d 673, 676 (6th Cir.1986). X Areeda, Hovenkamp and Elhauge, Antitrust Law (1990) at 95–96, ¶ 1737, specifically cites *A.I. Root* as rejecting the earlier case law that inferred market power from copyright or

trademark protection. *See also Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.,* 959 F.2d 468, 480 n. 15 (3d Cir.1992) (*en banc*) ("The plaintiffs do cite several old cases that viewed trademarks as creating presumptions of market power. But modern courts and commentators reject this position.").

11. Stephen Siwek and Philip Nelson note that an economic commodity that can be bought or sold can define a market. Siwek and Nelson Decem-

Thus, substantial authority suggests that a franchise and its continued operation can be a tying product.

## B. *Are the Products Associated with a Franchise Trademark Separate From the Franchise Itself?*

■ In the *Chicken Delight* case, portions of which have recently come under criticism, the Ninth Circuit held that a Chicken Delight franchise was a separate product from the various "commonplace articles" that needed to be sold to a franchisee in order to operate a Chicken Delight franchise. 448 F.2d at 47–49. In *Krehl*, the Ninth Circuit distinguished between a business format franchise such as the one involved in *Chicken Delight* and a product distribution franchise. 664 F.2d at 1353. The *Krehl* case noted that in contrast to a *business format* franchise, in a *product distribution* franchise where the trademark identifies the actual end product consumed—the ice cream sold by Baskin–Robbins—there are not two separate products but only one, and thus there could not be an illegal tie-in.[12]

Defendant argues, however, that the logoed products—including the paper goods and condiments bearing the LCE Roman man and other distinctive marks—that are allegedly being tied would not have any market value and could not be sold anywhere or used anywhere separate from a LCE franchise. LCE cites *Casey v. Diet Center, Inc.*, 590 F.Supp. 1561, 1563–66 (N.D.Cal.1984), that suggests that no tying can exist in a franchise context where the products and services allegedly tied have "no market distinct from that of the franchise itself." *Id.* at 1566. Defendant argues there is no separate market for the LCE logoed paper goods apart from a Little Caesar franchise.

The Supreme Court in *Jefferson Parish Hospital v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), noted that "the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." *Id.* at 19, 104 S.Ct. 1551. *Jefferson Parish* involved the market for anesthesiologists and the market for hospitals. The Court found that even though these were used together and functionally related, they were two separate products that could be selected and marketed separately.

Since the date defendant filed its motion, the Sixth Circuit in *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811 (6th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 2434, 138 L.Ed.2d 195 (1997) (hereafter "*PSI*"), reiterated the *Jefferson Parish* standard for determining whether there are two products for a tie-in claim. According to *PSI*, the issue is not whether the items provide a "functionally integrated package," but rather the "character of the demand for the two items." *Id.* at 815 (quoting 466 U.S. at 19, 104 S.Ct. 1551). In *PSI*, Honeywell manufactured and sold industrial control equipment ranging in price from $250 to $800,000 per unit. These devices were dependent on internal printed circuit boards. Ninety-five percent of the components on the circuit board were "generic components" that could be purchased from a component manufacturer or distributor. Five percent, however, were designed specifically for Honeywell by a third party manufacturer who was contractually bound not to sell these proprietary items to Honeywell equipment owners or to

---

ber 1997 Declaration. They add that the franchise rights created by Little Caesar franchise agreements is an "economic commodity" and can be traded in markets. They assert that during the period 1993–1995 LCE repurchased 241 Little Caesar franchises, and third parties purchased 597 Little Caesar franchises (Little Caesar March 29, 1996, Franchise Offering Circular). *Id.* at 3–4, ¶ 10. Thus, the authors conclude that there is "a distinguishable antitrust market for the right to operate as a Little Caesar[ ] franchisee."

**12.** The Fourth Circuit in *Principe v. McDonald's Corp.*, 631 F.2d 303 (4th Cir.1980), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981), took a different position with respect to franchising. It noted that when the tied items were integral components of the franchised business—such as carefully selected outlet locations and unique design associated with the trademark—there could not be a tie-in. The Sixth Circuit has never cited the *Principe* case in defining separate products, nor did the Supreme Court in considering the question of defining one versus two products in its *Jefferson Parish* case, 466 U.S. at 23 n. 35, 104 S.Ct. 1551.

independent service providers, such as the plaintiff in PSI. Like the LCE logoed products, these small number of Honeywell parts would have no market apart from Honeywell industrial control machines. PSI offered circuit board repair services to owners of industrial control equipment. Because PSI was unable to obtain the five percent of the circuit board components manufactured exclusively for Honeywell control equipment, it was unable to compete in the market for the repair of Honeywell circuit boards.[13]

Honeywell provided replacement parts for faulty circuit boards by replacing the entire board with a new or refurbished board, charging the customer 50% of the list price for a new board so long as the customer returned the defective board. Honeywell would thereafter evaluate whether the defective board could be repaired, and if it could it would be repaired and put back into the inventory for replacement boards. The question before the Sixth Circuit was whether there was a separate market for two products—"parts for the circuit boards" and "the servicing of circuit boards when a board required repair or replacement." 104 F.3d at 814. Like the LCE logoed products needed to operate an LCE franchise, these items—parts and service—were functionally related.

The lower court found there were not two separate products that could be tied in violation of the antitrust laws. The Sixth Circuit reversed the lower court. It noted that the Supreme Court in *Kodak* also dealt with whether the unique replacement parts for Kodak copiers were separate from the services utilized to repair a Kodak copying machine. The Supreme Court in *Kodak* determined that parts and service could be separate products if there is "sufficient consumer demand so that it is efficient for a firm to provide service separately from parts." *Kodak*, 504 U.S. at 462, 112 S.Ct. 2072, quoted in *PSI*, 104 F.3d at 815.

In applying the consumer demand test of *Kodak* to its facts, the Sixth Circuit in *PSI* framed the question as to whether it would "be efficient for a firm to provide some component parts separate from the circuit-board services." 104 F.3d at 816. It noted that "PSI's very existence indicates the possibility of a separate market for service, because PSI does not manufacture any of the component parts for the circuit boards but instead purchases them from third-party manufacturers." *Id.* The Sixth Circuit also noted in applying the consumer-demand test that 95% of the components necessary to construct a Honeywell circuit board were "available for sale either directly or through the manufacturer or a third-party distributor." *Id.* Obviously firms sold these generic parts separate from service.

In applying the consumer demand test to the present case, it is clear that the market for Little Caesar franchises is separate from the market for the goods and services, including logoed paper goods, necessary to run a Little Caesar franchise. Prior to the expansion of Blue Line to nearly all regions of the country, other private distributors, unrelated to Little Caesar, sold all the goods and services necessary to run Little Caesar franchises, including logoed paper goods. Yet, the Little Caesar franchises were sold separately by LCE and franchisees. Since the commencement of this suit, Little Caesar has also approved three alternate distributors of the goods necessary to run a Little Caesar franchise and has agreed to provide them logoed products to sell.[14] In the past, there was a period where PYA Monarch, one of the recently reapproved distributors, sold all of the products needed by LCE franchises except logoed goods, which at that time the Little Caesar franchises in the Atlanta area had to buy logoed separately from Blue Line.[15]

---

13. An economic expert at the trial contended that absent the restrictive policies of Honeywell, "PSI's market share [for repairing Honeywell control equipment] should be as high as twenty-seven percent." *Id.* at 814.

14. While none of these three distributors has entered the market, they were permitted to distribute products needed to operate a Little Cae-

sar franchise except for special proprietary dough and spice mixes.

15. This was in and before 1989, a time prior to Blue Line's 1990 merger into its parent corporation LCE. While Blue Line at the time was a subsidiary of LCE, the significant point is that some franchisees obtained their rights to operate a LCE franchise under the LCE trademark from

Thus, the past history as well as the current approvals of new distributors demonstrate that there is sufficient consumer demand both for logoed goods and the other goods necessary to operate a Little Caesar franchise to provide them separately from the sale and marketing of the Little Caesar franchise itself. Defendant's Motion for Partial Summary Judgment on the issue as to there being but one product should be denied.

IV. CAN THE CLASS PLAINTIFFS PROVE LCE HAS SUFFICIENT MARKET POWER IN THE TYING PRODUCT MARKET TO INVOKE THE *PER SE* RULE MAKING A TIE-IN ILLEGAL?

 While a claim of illegal tying can be attacked as an antitrust violation under a rule-of-reason analysis, this requires actual proof of market harm in the tied product that can involve complex analysis of whether the anticompetitive consequences of the tie are outweighed by procompetitive business justifications asserted by the defendant. When the *per se* rule against tying is invoked, market harm is presumed and this obviates the need for the extensive discovery and proofs of market harm and the balancing of procompetitive benefits against anticompetitive harms. The *per se* rule against illegal tying is a judicial shortcut available where risks of market harm are so obvious that courts will dispense with the cumbersome market harm inquiry and balancing. *See Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 350–51, 102 S.Ct. 2466, 2476, 73 L.Ed.2d 48 (1982). In the present case, class plaintiffs are asserting a *per se* tying violation and LCE's Motion for Partial Summary Judgment asserts that plaintiffs cannot prove sufficient power in the tying product market, as properly defined, to make any tie-in subject to a *per se* attack.[16]

one firm and obtained their food products and their logoed products from two separate firms. While Blue Line was the firm selling the logoed products, from an economic and antitrust point of view, it could have been a firm unrelated to LCE that was allowed to sell LCE's copyright and trademark protected products.

16. While plaintiffs' counsel, at a hearing on a more recent motion, asserted that they also challenge the defendant's actions under the rule of reason doctrine, this has not been briefed or argued in this motion. It has been my assumption in both of my earlier Reports and Recommendations on class certification and in this Report, that plaintiffs' challenge to defendant's conduct is under the *per se* tie-in doctrine. The cases cited and analyzed are *per se* tie-in cases, and this Report and Recommendation considers the sufficiency of market power in the tying product that is needed to make out a *prima facie* element of a *per se* tie-in claim. *PSI* states that the *per se* rule and rule of reason analysis

have, in effect, merged in recent years. Under traditional per se analysis, restraints of trade were condemned without any inquiry into the market power possessed by the defendant. *See, e.g., Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). However, under tying's per se rule, the seller must possess substantial market power in the tying product market. In addition, tying's per se rule provides for an inquiry into whether the defendant's conduct has procompetitive effects. *See Kodak*, 504 U.S. at 478–79, 112 S.Ct. at 2088–89. Such an extensive factual inquiry is hardly the stuff of per se analysis. Under rule-of-reason analysis, the antitrust plaintiff must show, inter alia, an adverse effect on competition. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29–30, 104 S.Ct. 1551, 1567–68, 80 L.Ed.2d 2 (1984). This circuit adopted the following three-step analysis for determining whether a tying arrangement is likely to cause such an anticompetitive effect: "(1) the seller must have power in the tying product market; (2) there must be a substantial threat that the tying seller will acquire market power in the tied-product market; and (3) there must be a coherent economic basis for treating the tying and tied products as distinct." *Hand v. Central Transp., Inc.*, 779 F.2d 8, 11 (6th Cir. 1985). Thus, in this circuit, market power in the tying product market is an indispensable requirement under either per se or rule-of-reason analysis. As Professors Areeda, Elhauge, and Hovenkamp comment, "the per se rule against tying is 'per se' in only one respect—namely, dispensing with proof of anticompetitive effects...." 10 PHILLIP E. AREEDA ET AL., ANTITRUST LAW ¶ 1760e, at 372 (1996). The merger of these two theories is apparent in the majority in *Kodak*, which does not even mention the terms "per se" or "rule of reason," even though *Kodak* was technically a per se case.

104 F.3d at 815.

This statement, which was not the matter at issue in *PSI*, is not my understanding of the relation of rule of reason analysis to *per se* tying analysis, nor does the section cited from *Kodak* support this PSI statement. While current case law and substantial academic literature tout the procompetitive effects on certain tying arrangements, the analysis of actual harm to competition and the balancing process is not part of a *per se* tying case unless, after plaintiff has made out the

As this Court has noted in its earlier summary judgment opinion the *prima facie* elements of a *per se* tie-in claim are:

1. there must be a tying arrangement between two distinct products;

2. the seller must have sufficient economic power in the tying market to restrain appreciably competition in the tied product market; and

3. the amount of commerce affected must not be insubstantial.

*Little Caesar Enter., Inc. v. Smith,* 895 F.Supp. 884, 894 (E.D.Mich.1995).

The earlier Report and Recommendation which this Court accepted addressed class certification of those LCE franchise owners who had signed the post–mid–1990 Franchise Agreement. Because this case does not involve an admitted tie nor an express tie clearly set out in the Franchise Agreement or other documents, a major issue in that class certification controversy concerned whether there was a tying arrangement under *prima facie* element # 1 above. Could class plaintiffs prove whether their purchase of logoed goods from Blue Line was actually a "coerced" or "forced" tie—i.e. an under- stood condition of continuing as a Little Caesar franchise—or was it a voluntary choice, and thus not illegal under antitrust law. The core dispute for class certification purposes was whether under Fed.R.Civ.P. 23(b)(3) class plaintiffs had sufficient *common* proofs of this "forcing" or "conditioning" to proceed as a class, or would the issue of "coercion" depend predominately on *individual* proofs. This Court determined that in light of the change in language in the mid–1990 Franchise Agreement, and the practical economic effects of the market realties and other internal documents of the defendant, this "coercion" issue on the "was there a tie" question could proceed by common proofs and thus class treatment was appropriate. Also, in determining whether the case could proceed as a class action, this Court did not inquire "into the merits of plaintiffs' claims" and "assum[ed] plaintiffs' legal theory was correct." *Little Caesar Enter., Inc. v. Smith,* 172 F.R.D. 236, 241, 261 n. 19 (E.D.Mich. 1997).

The "coercion" issue considered in that earlier class certification dispute dealt with *prima facie* element # 1 of a tying claim—is there a tie of two products? [17] The present

---

elements of the *prima facie per se* claim, the defendant then wishes to assert a procompetitive justification for the tying arrangement to rebut the *per se* presumption of harm to the market. Thus, a defendant can raise an *affirmative defense* of procompetitive effects of the tie which then triggers the balancing test and a review of alternative means available to defendant that fulfill the procompetitive aspect with lesser harm to competition. *See, e.g., United States v. Jerrold Electronics Corp.,* 187 F.Supp. 545, 560 (E.D.Pa. 1960), *aff'd,* 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961)(*per curiam* ). *See also Jefferson Parish,* 466 U.S. at 25 n. 42, 104 S.Ct. 1551 (where it classified alleged procompetitive effects by a defendant as a "goodwill" *defense* that is routinely rejected by a court's finding that less restrictive "contractual quality specifications" can protect a company's goodwill with less harm to competition than a tie-in).

In the present case, defendant is not in this motion asserting any procompetitive effects of its behavior. It is merely asserting that plaintiffs cannot prove market power in the tying product that is needed for them to invoke the *per se* antitying shortcut. While plaintiffs in the present case could attack an anticompetitive tie-in directly under the rule of reason by asserting that LCE's conduct has harmed competition in the market for foods and/or supplies sold to restaurants, this is not their claim. Rather, they are asserting a *per se* tying violation, and LCE is claiming they cannot prove an essential *prima facie* element of such a claim. Accord, *Digital Equip. Corp. v. Uniq Digital Technologies,* 73 F.3d 756, 760 (7th Cir.1996) (Easterbrook, J.).

Even if I am wrong on this analysis of when and whether the rule of reason balancing enters the *per se* tying picture, *PSI* notes that "in this circuit, market power in the tying product market is an indispensable requirement under either per se or rule-of-reason analysis." 104 F.3d at 815. Thus, a showing of no market power in the present case would defeat either claim.

The Areeda authors disagree with this position. They argue that even where a plaintiff cannot show market power in the tying product by large market share, an antitrust challenge can be made under the rule of reason test where substantial harm to competition can be shown in the tied product market. X Areeda, et al., at 45, ¶ 1734b4.

**17.** As noted in that Report, in the absence of express tie-in language in the franchise agreement there had to be proof of some "forcing" or "coercion" to take Product *B* in order to obtain Product *A*. This "coercion" or "forcing" is a necessary element of proving two products are tied when the tie-in is not clearly expressed in the contract or admitted by the defendant.

motion deals with element # 2—does the defendant have sufficient economic power in the tying market to invoke the *per se* tie-in doctrine. The core dispute on the present motion is how the relevant tying product market should be defined. Plaintiffs contend the tying product market is the market of LCE franchises and the rights to continue operating these economic entities. If that is the case, LCE has substantial market power in the tying product. Defendant argues that plaintiffs have defined the wrong market. As noted above, defendant argues that the appropriate market for antitrust purposes is the market either for carryout pizza franchises or for all fast food franchises of which they have less than 20% of the market which is insufficient for plaintiffs to invoke the *per se* tying rule.[18]

A. *Substantial Market Power in Tying Market After Fortner II and Jefferson Parish:*

■ Market power has been defined as the power "to force a purchaser to do something that he would not do in a competitive market" such as buying a "tied product that

the buyer did not want at all or might have preferred to purchase elsewhere or on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Parish,* 466 U.S. at 12 and 14, 104 S.Ct. 1551. It has also been defined as "the ability of a single seller to raise price and restrict output." *United States v. E.I. DuPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). It can be determined by various surrogate tests, but the most common is determining the defendant's share of the relevant market.

While earlier *per se* tying cases were quick to condemn tying arrangements without too much attention to the strength of the defendant's power in the tying product market, this ended when Justice White's dissent in *Fortner I*[19] gained favor with Justice Stevens and a substantially different Court in *Fortner II.*[20] United States Steel (through one subsidiary) was discriminating in price on certain tied sales—it charged more for

While this "coercion" element to prove the existence of a tie (*prima facie* element # 1) relates to a defendant's power, it is different (albeit overlapping to some extent) from the consideration of power in *prima facie* element # 2—does defendant have significant market power in the tying market to restrain appreciably competition in the tied product market.

This distinction is more clearly illustrated in the example used by Justice Black in *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 7, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958):

[I]f one ... food store[ ] in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself.

Assume the single food store that only sold flour [Product *A* ] if the buyer took sugar [Product *B* ] refused to admit this practice and used no written contracts with an express tie. Instead its cashiers used salesmanship, even overbearing tactics and threats to remove the sugar from the goods sold if the customer wanting flour did not also buy a bag of sugar. These sales practices would be evidence of "forcing" or "coercion" relevant to *prima facie* element # 1 on whether there is a tying arrangement.

In such a case, the proofs related to the "coercion" on *prima facie* element # 1 (are the two products tied in fact) are clearly separate from the proofs needed to show the seller had substantial market power in the market for Product *A*

(*prima facie* element # 2). The former would involve what the cashiers said and did, and the latter would involve proofs of market share in the sale of flour. Yet, the proofs on the separate elements are related because the effectiveness of the salesman tying the sale of sugar to flour is dependent on the degree of the seller's power in the market for flour. If the customer can obtain flour or a satisfactory substitute from another grocer, the customer is free to buy sugar elsewhere or not at all. While the tying store can continue to insist (and "force") the sale of sugar when a customer wants to buy flour, antitrust law is unconcerned because consumer choice and competition are not seriously harmed. The reason is that there is no proof of *prima facie* element # 2 on market power.

**18.** See n. 10 above.

**19.** *Fortner Enters. v. United States Steel Corp. (Fortner I),* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

**20.** *United States Steel Corp. v. Fortner Enters.(Fortner II),* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977). Justices Burger, Blackmun, Powell, Rhenquist and Stevens were not on the Court when *Fortner I* was decided. Even Justices Brennan and Marshall, in the majority in *Fortner I,* joined the majority of *Fortner II* which was unanimous on its treatment of market power in the tying market.

prefabricated homes that it sold to developers who financed those homes through another United States Steel subsidiary than it charged when the homes were purchased by a developer separately. The tying product loans were for 100% of the cost not only of the prefabricated houses, but also the land and development costs of the developer. These unique 100% loans were "unusually inexpensive" financing giving the U.S. Steel defendants power to attract credit hungry developers.

In assessing this tying arrangement, Justice Black in *Fortner I* suggested that economic power in the tying market for credit could be found when an "appreciable number" of buyers wanted the tying product sufficiently that they would take the tied product which they might have preferred to buy elsewhere, all other factors being equal. Because tie-ins were deemed to serve no legitimate procompetitive purpose that could not be achieved by a less restrictive means, Justice Black concluded that "the presence of any appreciable restraint on competition" can serve to trigger the *per se* tie-in doctrine.

> Such appreciable restraint results whenever the seller can exert some power over some of the buyers in the market .... despite the freedom of some or many buyers from the seller's power .... Accordingly, the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie in, with respect to any appreciable number of buyers within the market.

*Fortner I*, 394 U.S. at 503–504, 89 S.Ct. 1252. United States Steel by offering uniquely favorable credit terms (the tying product) was able to extract supracompetitive prices for its prefabricated houses (the tied product).[21]

After remand, Fortner prevailed in the lower court which allowed a finding that United States Steel had sufficient power in the credit market to invoke *per se* condemnation of the tying arrangement. When the case eventually returned to the Supreme Court, *Fortner II* held that a more careful analysis of actual power in the tying market was needed—even for "unique" products and for powerful defendants such as United States Steel. As is alleged in the present case concerning the full "market basket" of goods purchased from Blue Line, United States Steel was charging its tied customers supracompetitive prices for the tied product, and there were a substantial number of buyers accepting this "burdensome" tie.

Nonetheless, the Supreme Court held that the plaintiff had to prove that "the seller has the power, within the market for the tying product, to raise prices" or "to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market." *Id.* at 620, 97 S.Ct. 861. The defendant must have "some advantage not shared by his competitors in the market for the tying product." *Id.* at 620, 97 S.Ct. 861. Cheaper and more freely available credit terms are indeed a "unique" tying product, but this is because U.S. Steel was "willing to accept a lesser profit—or to incur greater risks—than its competitors." Without dissent, the *Fortner II* Court determined that this is not the "kind of uniqueness" that constitutes exploitable "economic power in the credit market." *Id.* at 621–22, 97 S.Ct. 861. The Court noted that United States Steel was willing "to provide cheap financing in order to sell expensive houses" and this "unique ... financing" does not support a finding that defendant "had the kind of economic power" which a plaintiff must demonstrate to invoke the *per se* rule against tie-ins.

*Fortner II* refused to infer market power from the fact United States Steel's prefabricated houses were sold at above-market prices, and there were a number of people that accepted its tie between credit and the purchase of these houses. The lack of apparent power for the fungible tying item—the market for money—led the Court to accept "the possibility" that the lower cost of bor-

---

21. Justice White in his *Fortner I* dissent determined first that there was nothing "unique" about the money U.S. Steel was lending other than its "low cost" which is "ordinarily no reflection of market power." *Id.* at 515, 89 S.Ct. 1252. He added that if the great credit deal was not available from any source other than U.S. Steel, then Steel's competitors in the prefabricated house market lost no possible sales in the "tied market" because the potential buyer/developers who needed such otherwise unavailable credit to build these houses could not buy prefabricated houses from a competitor of U.S. Steel.

rowing offset the higher cost of the houses, and the bundled package was thus "competitive." *Fortner II*, 429 U.S. at 618, 97 S.Ct. 861.[22] When a seller defendant clearly dominates a conventionally defined market, the finding of market power is an easy task. In other cases, it is a far more complicated task involving comparisons of the product the defendant is offering with that of the defendant's rivals. The defendant's and its rivals' prices and costs must also be compared for each of the products and for the combined package. It is possibly for this reason that courts, such as *Fortner II*, will not infer substantial market power solely from the existence of numerous ties coupled with above-market prices for the *tied* product.[23]

*Jefferson Parish* reiterated that significant power in the tying product market is needed to find a tie-in *per se* illegal. The Court defined the tying market as competing hospitals in the Jefferson Parish geographic area from which a patient (with the advice or preference of his or her doctor) could select. Defendant had only a 30% share of that market.[24] The Supreme Court considered this insufficient market power in the tying product to condemn East Jefferson Hospital

under the *per se* tie-in rule even though it unquestionably had a tie-in between the use of its surgical facilities and the services of its selected anesthesiologists. If patients, in consultation with their doctors, did not like East Jefferson Hospital's tie-in because it was more expensive or limited their free choice in the tied market, they could go to another hospital in the Jefferson Parish area and get a different anesthesiologist of their choice.

As commonly stated and recently reiterated by the Sixth Circuit, under tying's *per se* rule the seller must possess substantial market power in the tying product market. *PSI*, 104 F.3d at 815 n.2. Without significant market power in the tying product the defendant cannot force the buyer to pay higher prices or accept other burdensome terms such as buying a tied product on less favorable terms than offered by competitors or that the buyer would otherwise not have purchased at all.[25] As with every element of the *prima facie* case, plaintiffs have the burden of proof on showing significant market power in the tying market.[26]

One of the most thoughtful analyses of the "significant" aspect of market power is found

**22.** This suggests that before market power can be inferred from a number of customers accepting "burdensome" terms, a court must evaluate whether the terms of the tie really are "burdensome." One would need to know whether the quality-adjusted package price exceeds rival prices for the two products. One of the LCE claims argued in this motion that this Court need not address involves this issue of whether plaintiffs must prove that the total package is priced above market. (*See* Defendant's brief at 11–12.)

**23.** *See also Will v. Comprehensive Accounting*, 776 F.2d 665, 672–73 (7th Cir.1985), *cert. denied*, 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986) (the Seventh Circuit assumed the tied product price was above market but refused to infer power in the absence of a showing that the tied price for both items exceeded the market price for the two items sold separately). *Jefferson Parish* found no market power even though there were a substantial number of ties and an asserted indifference to price in the tied product due to market imperfections and information costs.

**24.** Power can be inferred from a large share of the relevant market or from other factors such as a unique product with no substitutes, *e.g.* a patented product, or substantial barriers to the ease of entry. *See Jefferson Parish*, 466 U.S. at 16,

104 S.Ct. 1551; *Tic–X–Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1420 (11th Cir.1987). Most of the cases involving proof of market power by methods other than a high share of the relevant tying market were before 1977 when *Fortner II* turned a more critical eye on assertions of substantial market power in the absence of substantial market share.

**25.** The Areeda treatise notes that *"Jefferson Parish* ... indicated that a defendant without power in the tying market can neither coerce customers to take an unwanted product from him nor significantly impair competition in the tied market." 466 U.S. at 11–13, 104 S.Ct. 1551. The Areeda authors use an example of "suppose that all franchisors require their franchisees to take certain supplies from the franchisor. If none of them has the requisite power individually, the per se rule would be inapplicable. Nor would the restraints be unreasonable when the aggregate foreclosures were but a minor share of the tied market." Areeda, et al., at 40, ¶ 1734a n. 6.

**26.** *A.I. Root Co. v. Computer Dynamics*, 615 F.Supp. 727, 733 (N.D.Ohio 1985), *aff'd*, 806 F.2d 673 (6th Cir.1986), placed the burden on the plaintiff to show not only a substantial number of customers accepted the tie, but their doing so could only be explained in terms of the defendants having market power.

in *Grappone v. Subaru of New England,* 858 F.2d 792 (1st Cir.1988), where Justice (then Judge) Stephen Breyer wrote for the First Circuit. He defined *"significant* market power" as necessitating "more than the mere ability to raise price only slightly, or only on occasion, or only to a few of a seller's many customers." *Id.* at 796. "To show market power, the seller must have a significant market share or sell a unique, such as a patented, product for which there are not readily available substitutes."[27] *Id.* A seller with limited ability to raise prices "cannot easily cause harm in *tied* product markets" and "cannot easily harm consumers." *Id.* at 796–97.

*Grappone* noted that without market power in Product *A,* the seller cannot force a buyer to take "a more expensive or less desirable Product B." *Id.* at 795. It notes that a seller with market power in Product *A* who has already exercised it by charging more for Product *A*

> cannot force buyers to take a more expensive or less desirable Product B, *unless* it provides buyers *equivalent* compensation by lowering the price of Product A (or maintaining Product A's price at a level lower than the Seller has the *power* to charge), for otherwise buyers, who were already paying as much as the Seller could charge them (with its degree of market power) would also likely switch to other sellers or discontinue use of Product A. *See Jefferson Parish,* 466 U.S. at 39 & n. 8, 40, 104 S.Ct. at 1572 & n. 8, 1573 (O'Connor, J., concurring). This is simply to make the logical point that "fully exploited" buyers would not take a less desirable Product B without compensation, for otherwise they were not being "fully exploited."

*Id.* at 795.[28]

The *Grappone* opinion notes that *Jefferson Parish* brings into visibility the upshot "counterintuitive" notion

that a "tie" does not hurt the typical buyer in any *obvious* way; one needs a more refined analysis to find the harm.

\*　　\*　　\*　　\*　　\*　　\*

The *Jefferson Parish* Court provides that more refined analysis. The majority and concurrence recognized that a Seller, possessing significant market power with respect to Product A, may cause anticompetitive harm by tying as follows: by reducing the price of Product A slightly (or by otherwise not fully exploiting its power with respect to Product A), the Seller may induce the Buyer to accept the tie; by doing so, the Seller may build a strong market position in Product B; and *that position* in Product B, in turn, may increase its power to charge high prices in respect to Product A. If a monopolist of patented can-closing machinery, for example, insists, as a condition of selling his machines, that their purchasers buy his cans, he will likely soon have a monopoly in cans as well as machines. And, that fact— the fact that he controls *both* cans and machines—may make his monopoly safer from competitive attack when his patent on the can-closing machinery expires. A new competitor would then have to enter *both* levels of the business (cans and machines) to deprive him of monopoly profits. And, this added security may enable the machinery monopolist to charge higher prices. The tie, by permitting the Seller to extend its market power from one level to two, may thereby raise entry barriers, providing security that helps a monopolist-seller further harm the consumer. This point is made both by the *Jefferson Parish* majority, 466 U.S. at 14, 104 S.Ct. at 1559, and the concurring justices, *id.* at 36–37, 39, 104 S.Ct. at 1570–71, 1572; *see also* 3 Areeda and Turner ¶¶ 725h, 733e.

---

27. As noted by Justice O'Connor in her concurring opinion in *Jefferson Parish,* even a patent does not make a product unique for purposes of determining market power if the relevant market contains reasonable substitute products to which a consumer can turn if the price of the patented item goes up significantly. 466 U.S. at 39–40.

28. *Jefferson Parish* suggests that this is not always the case because by tying *B* to *A* the seller

may camouflage the true price of each product. The Court notes that a seller might increase "monopoly profits over what they would be absent the tie" either by price discrimination (against the less informed consumer) or "perhaps by [the buyer's] inability to evaluate the true cost of either product when they are available only as a package." *See also* 466 U.S. at 15 and n. 24, 104 S.Ct. 1551.

Of course, in such circumstances, tying would hurt the Buyer or consumer only when it first hurts firms seeking to sell the *tied* product. Only if the tie significantly reduces the opportunities to sell Product B, can the tie significantly increase the Seller's power in respect to Product B, and thereby (*i.e.*, by raising entry barriers) increase the Seller's power in respect to Product A. *See Jefferson Parish*, 466 U.S. at 14, 18–25, 104 S.Ct. at 1559. And, insofar as tying impedes "competition on the merits," discouraging the search for innovation or efficiency, it does so in the *tied* product markets. *Jefferson Parish*, 466 U.S. at 14, 104 S.Ct. at 1559; 3 Areeda and Turner ¶ 725g;

\* \* \* \* \* \*

The majority and minority [concurring] opinions in *Jefferson Parish* disagree, not in respect to the nature of the link between tie and potential competitive harm, but in respect to the legal conclusions they would draw from the nature of this linkage. The minority would abandon the *per se* antitying rules and analyze tying under a "rule of reason"; it would prohibit tying only when according to its "demonstrated economic effects[,] ... [tying's] anticompetitive impact outweighs its contribution to efficiency." *Jefferson Parish*, 466 U.S. at 41–42, 104 S.Ct. at 1573–74. The majority would retain pre-existing *per se* rules; but it also breathes life into the screening function that the preconditions of those *per se* rules serve. The majority, for example, makes clear that by its requirement of "market power" it means *significant* market power—more than the mere ability to raise price only slightly, or only on occasion, or only to a few of a seller's many customers.

\* \* \* \* \* \*

That the "market power" hurdle is moderately high—that it cannot ordinarily be surmounted simply by pointing to the fact of the tie itself or to a handful of objecting customers—makes sense in light of the harms the anti-tying rules seek to avoid.... [V]irtually every seller of a branded product has *some* customers who especially prefer its product. But to permit that fact alone to show market power is to condemn ties that are bound to be harmless, including some that may serve some useful social purpose.

858 F.2d at 795–97 (various case citations and academic references omitted).[29]

While *Grappone* was pre-*Kodak*, and plaintiff Grappone was not "locked in" by high switching costs because the dealership in which he had "sunk costs" sold multiple brands of cars other than the Subaru, the opinion concludes that for most product distribution franchises or dealerships, the relevant tying market is the interbrand foremarket. In *Grappone*, the tied product was a package of Subaru parts, the tying *product* was the Subaru franchise, but the relevant tying product *market* was either all automobiles or all imported automobiles.

Subaru's market share, whether measured in terms of sales of all autos or of imports or in any other reasonable way, is minuscule. *See Kenworth of Boston, Inc. v. Paccar Financial Corp.*, 735 F.2d 622, 623–24 (1st Cir.1984) (tying product is Paccar trucks, relevant market is that for all heavy trucks); *Kingsport Motors, Inc. v. Chrysler Motors Corp.*, 644 F.2d 566, 571 (6th Cir.1981) (tying product is Dodge cars, relevant market is that for all medium priced automobiles sold in U.S.); *Anderson Foreign Motors, Inc. v. New England Toyota Distributor, Inc.*, 475 F.Supp. 973, 986 (D.Mass.1979) (tying product is Toyotas, relevant market is that for all new foreign and domestic cars); *see also A.I. Root Co. v. Computer/Dynamics, Inc.*, 806 F.2d 673, 675 (6th Cir.1986) (tying product is specialized computer equipment, relevant market is that for all small computers).

*Id.* at 797.

Thus, the *Fortner II–Jefferson Parish* cases insisted on a "more refined analysis" of the need for demonstrating substantial mar-

---

**29.** *Fortner II* also noted that most sellers have the ability to raise prices and not lose particularly loyal customers, but this limited "power" does not trigger the *per se* tying rule. 429 U.S. at 621 n. 14, 97 S.Ct. 861.

ket power in the tying product market before the probability of harm in the tied market is so high that it can be presumed under the *per se* tying doctrine. Thereafter, courts were reluctant to find market power in single brand products, no matter how coveted or unique, if other brands of the product might, at a certain price level, be selected as substitutes for the preferred brand.[30] If the interbrand competition in Product *A* is healthy, and no firm has a substantial market share suggesting market power in the pre-contract market, courts assumed that interbrand competition in the foremarket would police any market abuses by competing firms. Thus, with a competitive foremarket, if any firm had a tie-in of its Product *A* with Product *B*, the normal economic assumption would be that acceptance of the bundling was a voluntary consumer choice and not "coerced." *Jefferson Parish* involved clearly tied products in which substantial consumers acquiesced. *Fortner II* involved not only a substantial number of consumers accepting the tie of the credit and houses, but also proven above-market prices for Product *B* when obtained as part of a tie.[31]

B. *Kodak and Narrowed Market Definition:*

The Supreme Court in *Kodak* called into question the reluctance of courts to use a single brand product to define a market for antitrust tying purposes and its *per se* rule. Kodak sold photographic and micrographic equipment which the majority opinion defined as "unique" at least to the extent that software programs and parts that operated with Kodak's machines were "not compatible with competitors' equipment, and visa versa." 504 U.S. at 457, 112 S.Ct. 2072. It provided service and parts to its customers. Some of its unique parts were made by Kodak but most were made by licensed manufacturers. Independent service organizations ("ISO's") in the 1980's began repairing Kodak equipment, selling its parts, reconditioning and reselling used Kodak equipment. In 1985–86 Kodak began a policy of selling replacement parts only to buyers of its equipment who used Kodak's repair service or who serviced their own equipment. The manufacturers of those Kodak parts that Kodak did not make agreed not to sell such parts to anyone except Kodak. As a result of this new policy, ISO's were unable to get adequate parts to service or rebuild Kodak machines, and many went out of business. *Id.* at 458, 112 S.Ct. 2072.

The ISO's sued Kodak alleging an illegal tie under the *per se* rule that involved Kodak tying its service to its unique parts. After very limited discovery the district court granted Kodak summary judgment because the ISO's had provided no evidence that Kodak's *equipment* was tied to Kodak's *parts and service*—a claim that the ISO's were not making. The Ninth Circuit reversed noting that there was a disputed issue of fact over whether there were separate markets for the tying product (which the Ninth Circuit correctly recognized the ISO's were claiming was the unique Kodak repair parts) and the tied product (the Kodak service). Having determined that there was sufficient evidence to allow a finding that two product markets existed, the Ninth Circuit considered the question of whether "Kodak has sufficient economic power in the tying product market [parts] to restrain competition in the tied product market [service]." 504 U.S. at 460, 112 S.Ct. 2072 (quoting *Image Technical Service, Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 616 (9th Cir.1990), bracketed materials in original). Kodak argued that as a matter

---

**30.** Courts have consistently refused to consider one brand to be a relevant market of its own when the brand competes with other potential substitutes. *A.I. Root v. Computer Dynamics*, 615 F.Supp. 727, 733 (N.D.Ohio 1985), *aff'd*, 806 F.2d 673, 675–76 (6th Cir.1986), and the other cases cited in *Grappone* (small business computers was a relevant market, not just those that would run on BOSS software); *see also General Business Sys. v. North Am. Philips Corp.*, 699 F.2d 965, 972–75, 977–78 (9th Cir.1983) (small business computers and not the defendant's unique computer storage cards was the relevant market); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 672–73 (7th Cir.1985), *cert. denied*, 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986) (franchises for an accounting system).

**31.** There was clear price discrimination for the prefabricated homes in *Fortner II* between those who needed United States Steel's credit and those who did not.

of law interbrand "competition in the equipment market [prevented] Kodak from possessing power in the parts market." *Id.* While the Ninth Circuit acknowledged that this "theoretical" premise "might be true" it would not allow summary judgment on a factually thin record because "market imperfections can keep economic theories about how consumers will act from mirroring reality." 903 F.2d at 617. In its *certiorari* review, the Supreme Court majority opinion stated that "[t]he principal issue here is whether a defendant's lack of market power in the primary equipment market precludes—as a matter of law—the possibility of market power in derivative aftermarkets." 504 U.S. at 454–455, 112 S.Ct. 2072. It noted later that:

> Kodak does not present any actual data on the equipment, service or parts markets. Instead, it urges the adoption of a substantive legal rule that "equipment competition precludes any finding of monopoly power in derivative aftermarkets." ... Kodak argues that such a rule would satisfy its burden as the moving party of showing "that there is no genuine issue as to any material fact" on the market power issue.[11]

---

[11] Kodak argues that such a rule would be *per se,* with no opportunity for respondent to rebut the conclusion that market power is lacking in the parts market. ...

504 U.S. at 466, 112 S.Ct. 2072.

> A legal presumption against a finding of market power is warranted in this situation, according to Kodak, because the existence of market power in the service and parts market absent power in the equipment market "simply makes no economic sense," and the absence of a legal presumption would deter procompetitive behavior.

504 U.S. at 467, 112 S.Ct. 2072. The majority opinion notes that in considering Kodak's *per se* defense:

> To determine whether Kodak has met [its summary judgment] burden, we must unravel the factual assumptions underlying its proposed rule that lack of power in the equipment market necessarily precludes power in the aftermarkets.

> The extent to which one market prevents exploitation of another market depends on the extent to which consumers would change their consumption of one product in response to a price change in another, *i.e.* the "cross-elasticity of demand."

> \* \* \* \* \* \*

504 U.S. at 469, 112 S.Ct. 2072. Kodak argued that the Court should accept, as a matter of law, this "basic economic realit[y]" ... "that competition in the equipment market necessarily prevents market power in the aftermarket." 504 U.S. at 470, 112 S.Ct. 2072.

The Supreme Court in *Kodak* stressed that in considering market power, economic theory provides useful guides. Yet, textbook economic models cannot be a substitute for the actual facts and the market realities of the case.

> Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law. This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the "particular facts disclosed by the record." In determining the existence of market power, and specifically the "responsiveness of the sales of one product to price changes of the other," this Court has examined closely the economic reality of the market at issue.

504 U.S. at 466–67, 112 S.Ct. 2072 (citations omitted). At least in a case where the plaintiff has come forward with some evidence of a dysfunction in the theory that markets control prices by competition and free access to new competitors, the *Kodak* court stressed that defendant "bears a substantial burden in showing that it is entitled to summary judgment. It must show that despite evidence of increased prices and excluded competition, an inference of market power is unreasonable." *Id.* at 469, 112 S.Ct. 2072.

Citing *Jefferson Parish, Kodak* emphasized "[t]he relevant market for antitrust purposes is determined by choices available to Kodak equipment owners." *Id.* at 482, 112 S.Ct. 2072. "The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities'

faced by consumers." *Id.* (quoting *United States v. Grinnell,* 384 U.S. 563, 572, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). *Grinnell* had held that after defining the appropriate market, monopoly may "ordinarily be inferred from the predominant share of the market." 384 U.S. at 571, 86 S.Ct. 1698.

The Court stated that "Kodak's theory does not explain the actual market behavior revealed in the record." 504 U.S. at 473, 112 S.Ct. 2072. The ISO's had come forward with some evidence that was inconsistent with the general economic theory. They demonstrated that Kodak had raised prices and driven out ISO competition in the aftermarkets. 504 U.S. at 477, 112 S.Ct. 2072.

The Court found that:

Respondents [the ISO's] offer a forceful reason why Kodak's theory, although perhaps intuitively appealing, may not accurately explain the behavior of the primary and derivative markets for complex durable goods: the existence of significant information and switching costs. These costs could create a less responsive connection between service and parts prices and equipment sales.

504 U.S. at 473, 112 S.Ct. 2072.

The *Kodak* majority also noted that there was other evidence consistent with illegal ties. There was evidence of price discrimination favoring those Kodak customers who serviced their own equipment (which might be the more sophisticated customers) and thus could avoid any supracompetitive pricing of Kodak service. The Court added:

Service prices have risen for Kodak, but there is no evidence or assertion that Kodak equipment sales have dropped.

504 U.S. at 472, 112 S.Ct. 2072.

In light of these factors and "higher service prices and market foreclosure," the Court chided that "Kodak's service and parts policy is simply not one that appears always or almost always to enhance competition." *Id.* at 478–79. The Court concluded that Kodak

has failed to demonstrate that respondents' inference of market power in the service and parts markets is unreasonable, and that, consequently, Kodak is entitled

to summary judgment. It is clearly reasonable to infer that Kodak has market power to raise prices and drive out competition in the aftermarkets, since respondents offer direct evidence that Kodak did so. It is also plausible ... to infer that Kodak chose to gain immediate profits by exerting that market power where locked in customers, high information costs, and discriminatory pricing limited and perhaps eliminated any long-term loss.

*Id.* at 477–78 (footnote omitted).

Justice Scalia, in his dissenting opinion, makes it clear that if Kodak had from the outset tied a lifetime parts and service warranty to the sale of its micrographic and photocopying equipment, or if it had announced its policy of limiting parts sales solely to customers who serviced their own machines, then the customers would have bought the equipment in the first hypothetical situation with knowledge of the tie between equipment and parts and service, and in the second hypothetical "with the knowledge that aftermarket support could be obtained only from Kodak." 504 U.S. at 491, 112 S.Ct. 2072. In both of these cases, Justice Scalia argues that "the *tying* product market would be the *equipment* " market in which Kodak had no market power that could have "effectively forced consumers to purchase Kodak micrographic or photocopying machines subject to the company's restrictive aftermarket practices." In such a case, summary judgment would be appropriate insofar as application of the "*per se* rule was concerned." *Id.*

There is nothing in the majority opinion to suggest that they disagree with either of these two hypotheticals of (1) an *express tie-in* or (2) an *announced* policy even though either hypothetical would foreclose ISO's from servicing Kodak machines. Justice Scalia notes that on the facts available to Kodak customers, at least after 1995, most of the purchasers of micrographic equipment and all of the

purchasers of new Kodak copiers, could have been aware of Kodak's parts practices. The only thing lacking to bring all of these purchasers (accounting for the vast bulk of the commerce at issue here)

squarely within the hypotheticals we have described is concrete evidence that the restrictive parts policy was announced or generally known.

*Id.* at 492, 112 S.Ct. 2072.

In Justice Blackmun's majority opinion response to this assertion, there is absolutely no disagreement with the legal premise Justice Scalia uses. Rather, it is the lack of undisputed factual support in the record for the legal premise that Justice Blackmun determines is the bar to summary judgment. His majority opinion responds, "[b]ut the dissent's 'only thing lacking' is the crucial thing lacking—evidence." *Id.* at 477 n. 24, 112 S.Ct. 2072. Again, Kodak was moving for summary judgment based solely upon its economic theory and had submitted no evidence to counter that of the plaintiffs. This footnote suggests that had there been adequate undisputed evidence that the restrictive parts policy was announced or generally known, the majority's concern over information and switching costs would no longer have existed, and summary judgment would have been granted to Kodak on the *per se* tie-in claim.[32]

If Kodak customers before purchasing their machines knew that parts would only be available to Kodak equipment owners who used Kodak's service or who serviced their own machines, these customers would also know that if they bought the Kodak machine, they would have to forego getting service from an ISO if their machine later failed. The reason most customers would know this is that if the Kodak restrictive parts policy is generally known, *it is obvious* to potential Kodak customers that ISO's would not have new replacement parts available. While this information may not solve the information cost problem of accurate life-cycle pricing, it at least gives enough information to a substantial number of potential Kodak customers *before they lock in* by purchasing a Kodak machine, that they face certain risks on future Kodak parts and/or service costs. Then these customers would have the free-

dom of: (1) shopping around with other equipment manufacturers to compare their price, parts and service policies and possibly find a better deal; or (2) seek contractual protections from Kodak through extended warranties or some price guarantees for parts and service either via fixed pricing lists or "most favored customer" protections; or (3) knowingly gamble that their machine will not break down or Kodak will fix it without exploiting them on price for parts and/or service. Thus, in *Kodak,* if the restrictive parts policy were "generally known" before buying a Kodak machine, it is possible that there would be enough sophisticated potential Kodak customers around so that the equipment market would police and limit Kodak's aftermarket power to act opportunistically.

Yet, the *Kodak* majority immediately notes that this is not necessarily the case. If "[a]cquiring the information is expensive," many may choose not to obtain it, limiting the number of informed customers. *Id.* at 474, 112 S.Ct. 2072. Second,

if the number of sophisticated customers is relatively small, the amount of profits to be gained by supracompetitive pricing in the [tied product] market could make it profitable to let the knowledgeable consumers take their business elsewhere. More importantly, if a company is able to price discriminate between sophisticated and unsophisticated consumers, the sophisticated will be unable to prevent the exploitation of the uniformed.

*Id.* at 475, 112 S.Ct. 2072.

While Justice Scalia's hypotheticals would lessen the precontract information costs through an announced or generally known policy, they do not address those who learn the information after purchase where they are locked in by their sunk costs. While in some situations the need to attract new customers may protect those customers who are locked in, the majority notes that where "the

---

**32.** The Areeda treatise notes that in considering a known policy of not making unique parts available to independent repairs,

[t]he *Kodak* dissent urged that the relevant tying product would be the machine if Kodak's policy of not selling repair parts to indepen-

dent service organizations were generally known to machine buyers. The majority apparently agreed when it emphasized the absence of evidence that Kodak's policy was generally known.

AREEDA at 150, ¶ 1740 (footnotes omitted).

number of locked in customers were high relative to the number of new purchasers" or where "the seller can price discriminate between its locked in customers and potential new customers," the strategy of a tie-in and supracompetitive pricing for the tied product may "prove profitable." *Id.* at 476, 112 S.Ct. 2072.

Thus, while the majority seems to agree with Justice Scalia's two hypotheticals where there is evidence that the tie-in policy is announced or generally known pre-contract, it suggests several additional scenarios where a seller could exploit pre-contract information deficiencies and post-contract switching costs and not be constrained in its opportunism by the need for new sales or by sophisticated customers.

The two hypotheticals noted by Justice Scalia—with which the *Kodak* majority implicitly agrees *if and when* supported by actual evidence and not merely by economic theorizing—are relatively simple because the market implications or risks of such announced or generally known information would be *obvious* to most consumers.

What is less clear from *Kodak* is whether its narrowed tying market definition is avail-able when the implications or risks flowing from what is "announced" or "generally known" precontract are *not obvious* to most reasonable potential consumers, and will not apprise them of the potential risk of future seller opportunism prior to getting "locked in" by purchasing the product without shopping around or seeking contract protections. In such a case, particularly where new foremarket sales are less important or can be preserved by discounts or price discrimination, the foremarket competition will not protect substantial "locked in" customers from aftermarket opportunism and exploitation.[33]

The *Kodak* case evoked an avalanche of professional and academic writing seeking to determine its exact meaning and potential reach. It has also been a source of substantial litigation in federal courts. One academic commentator has asserted the *Kodak* case and its discussion of the impact of information costs and switching costs on market definition has raised an issue that is "one of the most conceptually difficult courts face in antitrust litigation." Warren S. Grimes, Antitrust Tie–In Analysis After Kodak: Understanding the Role of Market Imperfections, 62 Antitrust L.J. 263 (1994).[34]

---

33. As I note later, there may be in this case a disputed issue of material fact whether the mid–1990 Franchise Agreement disclosed enough for a reasonable potential consumer of LCE franchises to know (what the evidence suggests LCE knew) that (1) if many mid–1990 franchisees expose themselves to an LCE/Blue Line tie-in of logoed goods (which was "generally known" or for most franchise shoppers fairly obvious from the language in the mid–1990 Franchise Agreement and other readily available facts), and (2) if LCE refused to sell logoed paper goods to alternative distributors, then (3) this would raise entry barriers and the ability to compete for alternative distributors because of many franchisees' preference for one stop shopping and the fact that logoed goods had higher profit margins than the other items in the "market basket" of products needed to operate a LCE franchise. This latter impact on potential alternate distributors' ability to enter the market and compete with Blue Line is not "so obvious" that this Court could, on this record, determine that it was "generally known" for purposes of granting partial summary judgment.

34. Professor Grimes argues:
 The cases suggest the need to adopt a test for tie-ins that accounts for market imperfections. Making market power the exclusive key to anticompetitive injury pressures the courts to define the market narrowly to adjust for market imperfections that are present in tie-ins. A case such as Kodak presents the issue of a harmful tie because of market imperfections, not because of any fundamental structural problem with the micrographic industry. If the Court stretches market definitions to allow for these imperfections, market definitions are distorted. For example, when the Court defines the market to include only Kodak spare parts, this definition would have possible ramifications for merger analysis under Section 7 of the Clayton Act or for monopolization suits under Section 2 of the Sherman Act. Yet the structural remedies often used in merger or monopolization suits are surely inappropriate in a case like Kodak.
 Courts can reconcile this tension by simply decreeing that separate standards govern market definitions in tie-in cases. But such a declaration is likely to lead to more confusion on an issue that is already one of the most conceptually difficult courts face in antitrust litigation. If, instead, there is forthright recognition that market shares are not dispositive when the harm from a tie arises from market imperfections, much of the pressure to distort market definitions is reduced. Market definitions will still be critical in determining wheth-

This author argues that "the confused and unsatisfactory state of current substantive law on tie-ins" could be improved with "a forthright recognition that market shares are not dispositive when the harm from a tie arises from market imperfections" and franchisor opportunism occurring after a franchisee is locked in. He argues that looking at market imperfections in light of the underlying policies and harms that antitrust tie-in law seeks to address would reduce "much of the pressure to distort market definitions . . ." *Id.*[35]

In other situations, the *Kodak* majority opinion is consistent with a reading that in light of what a defendant has announced and what is generally known the information concerning other consequences that the defendant may later be able to exploit is not sufficiently known, obvious or reasonably knowable so that in such a case, even with an announcement or general knowledge of certain facts, other substantial information costs remain and a *Kodak* lock-in theory market definition may still be possible.

In the present case, even if LCE's tying of logoed goods to continued operation of a Little Caesar franchise was announced or generally known pre-contract to the class plaintiffs, were most of these franchisees unaware pre-contract of the negative impact of this tie on alternate distributors' ability to enter the market and effectively compete

with Blue Line? Would Little Caesar's awareness of these facts and later exploitation of locked in franchisees permit these franchisees to successfully assert a *Kodak* type market definition because of their remaining information costs and switching costs even if they knew the logoed items were tied? Unlike Justice Scalia's two hypotheticals where the market consequences were *obvious*, here the consequences of an announced or generally known tie were not so obvious. While Justice Blackmun seems to implicitly agree with Justice Scalia's two hypotheticals (when actual evidence, and not just theory, supports them) his opinion clearly seems to leave the door open to a narrowed market definition where there remains substantial information and switching costs that are actively exploited by the defendant.

## C. *PSI Repair Service v. Honeywell, Inc.:*

In the Sixth Circuit's *PSI Repair Services, Inc. v. Honeywell, Inc.,* 104 F.3d 811 (6th Cir.1997), case, Honeywell, like Kodak, has a restriction on sale of its unique repair parts except as a part of its service.[36] In *Kodak* and *PSI*, the asserted market power came from the sunk costs or costs of abandoning expensive equipment and switching to other equipment. This "power" comes with any investment in something that later requires aftermarket goods or parts that are not available from sources other than the seller.

---

er a tie is associated with cartel behavior or likely to raise competitors' costs. But in testing for such injury, there would appear to be no reason to define the tying product market any differently than would be done in a merger or monopoly case.

*Id.* at 316–17 (footnote omitted).

35. The author notes that the ability of a buyer to negotiate with the seller for contractual protections before purchasing a tying product may not be an adequate pre-contract safeguard if market imperfections affect the buyer's motivation. "[T]he real issue is not whether corrective mechanisms exist for knowledgeable buyers but how quickly and how pervasively knowledge of the unfavorable terms of the seller's tie will permeate the market." *Id.* at 175 n. 44.

While consumer information pervades real world markets, that does not mean that certain information costs should not lead to antitrust remedies when they are exploited by sellers.

The proper distinction here is that, as a policy matter, the law should address active and in-

tentional behavior that creates new consumer injury even if a similar injury created by a seller's passive reliance on market imperfections is beyond the law. Like deceptive advertising or securities fraud, a seller's use of a harmful tie is voluntary and intentional behavior and it results in additional harm that would not occur if the seller were passively benefiting from market imperfections.

*Id.* at 280.

36. As noted above, the Sixth Circuit found that notwithstanding Honeywell's denials, it was providing *service* as a separate product from its parts even though it immediately replaced a customer's defective control panel with a replacement panel. While it did not "service" all control panels, customers had to return the defective control panels. Honeywell then examined the returned defective panels and repaired many of them. These "serviced" control panel were placed in the inventory of control panels used to replace defective ones for its customers.

If the seller seeks and is financially dependent on continued sales in the foremarket, it risks substantial harm to its reputation and future sales if it uses aftermarket "leverage" to exploit its old customers by charging prices significantly above-market for aftermarket goods or by forcing a tie to another product or service. If prior to a purchase the customer knows of the existence of, or the reasonably foreseeable risk of, a tie or excessive pricing for needed aftermarket goods, that customer has the freedom to accept those terms and risks, seek a competitor's package without such risks, seek alternate contract protections, or forego the investment altogether. In such cases the concerns of antitrust tying law with either limiting a consumer's free choice in the market or excluding potential competitors from the market do not arise because competition in the foremarket should police opportunistic behavior in the aftermarket. What prevented this freedom of informed choice in *Kodak* was the fact that Kodak changed its policy after a substantial number of consumers had bought their machines and were locked in.[37]

In *PSI*, when considering the implications of *Kodak* for what an equipment manufacturer must do before a plaintiff can assert a single brand market as a tying product market, the Sixth Circuit focused on what actions the manufacturer undertook to increase or take advantage of the *information costs* faced by a potential consumer. It looked to what most consumers would have known.[38] *PSI* quotes Justice Blackmun's response to Justice Scalia's dissent regarding "[t]he only thing lacking" is evidence that Kodak's "restrictive parts policy was ... generally known." 104 F.3d at 819 (quoting 504 U.S. at 477 n. 24, 112 S.Ct. 2072). It agreed with the interpretation of *Kodak* as holding that if

> its policy [of tying service to the availability of replacements parts] was generally known, the Court would have considered Kodak copiers as the tying product and service and parts combined as the product being tied. *See* 10 Phillip E. Areeda, et al., ANTITRUST LAW ¶ 1740c, at 150 (1996).

104 F.3d at 819. The Sixth Circuit joined the First and Seventh Circuits in limiting the availability of a *Kodak* single brand tying market "to situations in which the seller's policy was not generally known." *Id.* It noted case authority holding that "[t]he material dispute that called for a trial was whether the change in policy enabled Kodak to extract supra-competitive prices from customers who had already purchased its machines." *Id.* (citing *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763

---

**37.** In *Kodak*, any buyer of the equipment without an extended warranty or a service contract with fixed prices could, on a moment's reflection, realize that the manufacturer had the power to raise replacement parts to above-market prices or condition their availability on purchasing above-market price service from Kodak. The majority, however, did not use this "could have known" information about the risk to bar the potential availability of a narrowed tying market definition.

Assuming our inferences noted above about Justice Blackmun's footnote 24 response to Justice Scalia are correct, then the majority would have denied the narrowed tying market definition if this policy were announced or generally known. The narrowed market definition is not necessarily foreclosed if the risk is "knowable" but not obvious or generally known. The majority may have left this potential availability of a narrowed tying market definition because the general economic assumption is that a manufacturer's concerns about its reputation in the foremarket and its desire for future equipment sales would prevent its aftermarket opportunism. Thus, not only was its change of policy not "obvi-

ous," it ordinarily would not be anticipated because of its potential for harm to Kodak's reputation in the equipment market.

**38.** The use of "generally known" in *Kodak* and *PSI* suggests that a narrowed tying product market definition would not be available if a sufficient number of reasonable customers knew enough pre-contract to be "sophisticated" and thereby "police" the market in some manner for the less sophisticated. Thus, the unsophisticated customer will not have an antitrust claim using a *Kodak* market definition if competitive forces in the market are maintained through what is known by a sufficient number of sophisticated customers. This situation might be different if the seller can identify the informed/sophisticated customers and discriminate in their favor by lower prices or exclusion from the tying arrangement. Yet, where the market operates with reasonable effectiveness and the informed consumers protect most of the uninformed consumers, any injury incurred by the ignorant, reckless or foolish consumer will have a legal remedy, if at all, in contract, fraud or consumer protection law but not in antitrust.

(7th Cir.1996)). The *PSI* panel found that in the facts of *Kodak* it was "the change in policy" by the defendant that was "the crucial factor in the Court's decision."

> By changing its policy after its customers were "locked in," Kodak took advantage of the fact its customers lacked the information to anticipate this change. Therefore, it was *Kodak's own actions that increased its customers' information costs*. In our view, this was the evil condemned by the Court and the reasons for the Court's extensive discussion of information costs. While PSI's argument seems to suggest that *Kodak* supports a finding of market power whenever information costs are present, such a position cannot be reconciled with *Jefferson Parish*.

104 F.3d at 820 (emphasis supplied).

The Sixth Circuit then noted that plaintiffs in *Jefferson Parish* also argued that information costs should be considered in defining the market as the "single brand" East Jefferson Hospital instead of all the hospitals in the Jefferson Parish area. Yet, the Supreme Court rejected that argument noting that "while these factors may generate 'market power' in some abstract sense, they do not generate the kind of market power that justifies condemnation of tying."

The *PSI* case interpreted this to mean that:

> Put another way, the Court rejected the premise that imperfect consumer informa-

tion resulting from basic market imperfections could be used as a basis to infer market power for purposes of the Sherman Act.

*Id.* at 820.

The Sixth Circuit concluded:

> In light of our reading of *Jefferson Parish* and *Kodak*, we thus hold that an antitrust plaintiff cannot succeed on a Kodak-type theory when the defendant has not changed its policy after locking-in some of its customers, and the defendant has been otherwise forthcoming about its pricing structure and service policies. This rule should encourage manufacturers to divulge all relevant information at the time of sale. While we recognize that some information costs will still exist even with full disclosure by a seller ... these additional information costs stem from the fact that our economy is not one of perfect information, a factor that alone should not invoke antitrust condemnation. Accepting PSI's argument would expose many manufacturers of durable, expensive equipment to potential antitrust liability for having inherent power over the aftermarkets of their products, a result certainly not intended by *Kodak* and not consistent with *Jefferson Parish*.

*Id.* at 820 (emphasis supplied).[39]

These passages make it clear that for a *Kodak* single brand or other narrowed market definition to be available to plaintiffs,

---

39. While the Sixth Circuit in *PSI* said that the "evil" that the *Kodak* decision condemned "was Kodak's own actions that increased its customers' information costs" (104 F.3d at 820), this is not a complete statement of what *Kodak* seems to condemn. It would be true that "Kodak increased its customers' information costs" only if *prior to sale* (1) it had already changed its parts policy but few customers yet knew this, or (2) it had already decided to change its parts policy in the future but chose not to disclose it. In these two situations, "Kodak's own actions," or rather inaction by a choice not to disclose to each potential customer, would have increased the customers' cost of finding out this information. Full disclosure by Kodak would have lowered the information costs. *PSI* noted how Honeywell's disclosures actually "reduce[d] the information costs faced by its customers." 104 F.3d at 821. What appears to have occurred for many of Kodak's equipment customers is that after they bought Kodak equipment, Kodak took advantage

of these customers' sunk costs and switching costs by its post-sale action of changing its parts policy.

The *Kodak* majority opinion seems to leave open an antitrust law condemnation of this use of market power even if Kodak did not decide to change its parts policy until after the contract and would, therefore, not be subject to any common law claim for misrepresentation by knowing concealment of a material fact. Rather than "Kodak's own actions ... increas[ing] its customers' information costs" (*id.*), Kodak's post-contract action took advantage of many customers' switching costs. The *Kodak* majority's discussion of lock-in and switching costs makes it clear that this is what the majority opinion would, on certain facts, condemn. It is also clear in other language of *PSI* that the Sixth Circuit agrees with this. It suggests that "an antitrust plaintiff can[ ] succeed on a *Kodak*-type theory when the defendant has ... changed its policy after locking-in some of its customers."

only some of the consumers need to have become locked in at a time they lacked certain critical information. Yet, in most situations, that lack of information needs to be something more than the result of general market information deficiencies or market uncertainties that are normally recognized. Thus, even these ignorant consumers who get "locked in" and become exploitable cannot claim a *Kodak*-type tying market if the information that they lacked was "generally known" to others or if their lack of information was not caused or made relevant by some action of the defendant. It can be assumed that the "generally known" language that *PSI* uses three times means information that is available to the "reasonably prudent consumer," because antitrust is not intended to protect the careless or imprudent consumer but to protect competition by considering what the reasonable consumer would know, or could know if it made economic sense to do more research.[40] For antitrust purposes, the reasonable consumer can protect the efficient workings of the market and, to a certain extent, protect the carelessly ignorant and imprudent consumer. If antitrust *per se* tie-in claims were available to every carelessly ignorant consumer who gets "locked in" to some investment, they would become the "all-purpose remedy" for the unweary whenever their damages were significant.[41]

█ Thus, in light of *PSI*, a *Kodak*-type lock-in definition of market power in the tying product is not available whenever there are information costs upon which a seller passively relies to its benefit.[42] Rather, the

---

*Id.* at 820. It suggests further that where the seller's policy change was made pre-contract but kept secret, or at least was not "generally known," a *Kodak*-type theory might be available where "the defendant has [not] been otherwise forthcoming about its [change in or plan to change] policies." *Id.*

The information costs that *PSI* notes were discussed and dismissed in *Jefferson Parish* were not ones that the East Jefferson Hospital exploited by some post-lock-in change of policy as apparently occurred in *Kodak*. That is why *PSI* notes that "information costs tied in" from market imperfections "alone should not invoke antitrust condemnation." *Id.* at 820. But, a post-lock-in opportunistic change in policy to exploit these market imperfections could trigger a *Kodak*-type approach to market power. (This seems to be what occurred in *Virtual Maintenance, Inc. v. Prime Computer, Inc.*, 11 F.3d 660, 663 (6th Cir.1993) ("*Virtual II* ")). It is also a caveat highlighted in *PSI:*

> If there were any evidence in the record that Honeywell took advantage of its customers' imperfect information in order to reap supracompetitive profits in the aftermarkets for its equipment, we would not hesitate to allow a Kodak-type theory to be submitted to the jury. However, we can find nothing in the record or PSI's brief that alleges that Honeywell engaged in such activity.

104 F.3d at 821.

Thus, *PSI* and *Kodak* seem consistent with Professor Grimes' analysis of the post-*Kodak* scope of antitrust law. Professor Grimes notes that "[t]he proper distinction here is that, as a policy matter, the law should address active intentional behavior that creates new consumer injury even if a similar injury created by a letter's passive reliance on market imperfections is beyond the law." Grimes, *supra*, at 280. See full quote above at footnote 36.

In *Jefferson Parish*, the market imperfections that the Court dismissed for antitrust market power purposes were those that worked to the advantage of all the rival hospitals in the area. Thus, East Jefferson Hospital was a "passive" beneficiary of these market imperfection, and it derived no significant market power for antitrust purposes from these market imperfections that also benefitted its rival hospitals. The Court noted that the one "profit enhancing" factor which resulted from East Jefferson's use of nurse-anesthetists was not related to any market imperfection and was a common practice "utilized in all hospitals in the area." 466 U.S. at 28 n. 47, 104 S.Ct. 1551.

40. The Areeda authors note that "antitrust law does not seek to protect the foolish consumer who can fully protect himself by taking the steps that most similarly situated consumers take (or are presumed to take)." AREEDA, ET AL., ¶ 1735d2, p. 67. "We conclude that any power resulting from consumer failure to use readily available information, as used by most buyers, is not the kind of power that triggers the per se rule." *Id.* at ¶ 1735d, p. 69. The Areeda authors suggest that a buyer's indifference or ignorance about market prices or the seller's opportunistic exploitation of an incomplete contract does not constitute "market power unless buyer ignorance was the result of a general 'market failure' making the necessary information too costly for most buyers to obtain efficiently." *Id.* at 69, 104, ¶¶ 1735d3 and 1738c.

41. *Cf. Kodak*, 504 U.S. at 503, 112 S.Ct. 2072 (Scalia, dissenting).

42. Other similarly situated sellers could also obtain these benefits flowing from basic market imperfections.

*Kodak*-type narrowed market definition is available for a *per se* tying claim when:

1. there are information costs that prevent certain information from being "generally known;" and

2. these information costs are sufficiently high that a reasonable consumer would not anticipate (and it would not be cost efficient to invest more in the acquisition of additional information on) the risk of some change of policy post-contract that would expose the consumer to a burdensome tie involving above market pricing; [43] and

3. after a substantial number of customers have sunk significant costs that are not recoverable and face other switching costs, the seller takes some action changing its policy (or acting on a prior undisclosed policy) that takes advantage of its locked in customers' lack of information in order "to reap supracompetitive profits" by imposing a burdensome tie-in.

While not discussed in *PSI*, a *Kodak*-type market may be available even where a significant number of consumers in the pre-contract market may be sophisticated and knowledgeable, but these consumers will not police post-contract exploitation of locked in customers either because new sales in the pre-contract market are of lesser financial concern to the seller or the seller can price-discriminate or take other steps to assure the knowledgeable customers they will not be exploited post-contract.

D. *Areeda, Hovenkamp and Elhauge on Kodak:*

1. The *Kodak* Analysis:

■ Before allowing *Kodak*'s "market imperfections" and "lock-in" arguments to be used to define a narrow aftermarket for purposes of defining market power, Professors Areeda, Hovenkamp and Elhauge would require four conditions:

I. A substantial number of customers must have made brand-specific investments that still have a useful life but that are substantially unrecoverable if they shift to other brands.

II. A substantial number of those customers must be too ignorant of "lifecycle" prices to protect themselves by judicious interbrand comparisons or by contract before they become locked in .... (This ignorance can be caused by the rational consumer who determines that the cost of acquiring relevant information exceeds its benefits).

III. The knowledgeable customers who can protect themselves must either be unimportant to the defendant or be protected by effective price discrimination from above-market prices paid by the ignorant .... [44]

IV. The ... resulting ability to exploit the ignorant must be "substantial."

AREEDA, ET AL., at 138, ¶ 1740 (references to paragraph subsections omitted).

The authors concluded that:

[C]ourts should not infer substantial market power simply from the information imperfections that are common in the world's numerous product-differentiated markets. The courts should continue to find a lack of power, even at the summary judgment stage, in most cases in which appliances, office and household electronics, and other products with a significant "design" component are sold in a reasonably competitive market in which many purchasers are reasonably well-informed, especially when substantial price discrimination is not feasible.

*Id.* at 141, ¶ 1740.

This conclusion is consistent with *PSI's* and *Jefferson Parish's* acceptance of certain information costs as well as with the holding of *Kodak*, if the latter ruling is read and limited in light of the procedural posture in which the case was presented. In the ab-

---

43. Thus, a consumer pre-contract is deprived of the opportunity to shop around with rivals, seek contract or other protections from the seller, knowingly accept the risk or forego the investment.

44. Areeda, et al., note that "higher prices ... do not reflect [market] power when they disfavor the knowledgeable ...." *Id.* at 138, ¶ 1740.

sence of much discovery and any evidentiary submissions, the Supreme Court merely rejected Kodak's position that "the Court should accept, as a matter of law [the] 'basic economic realit[y],' ... that competition in the equipment market necessarily prevents market power in the aftermarket." *Kodak,* 504 U.S. at 470, 112 S.Ct. 2072. "Kodak argues that such a rule would be *per se,* with no opportunity for respondents to rebut the conclusion that market power is lacking in the parts market." *Id.* at 466 n. 11, 112 S.Ct. 2072.

The Areeda treatise argues that courts should read *Kodak* merely as rejecting the irrebuttable nature of the presumption from the "basic economic realit[y]" and rather make it a rebuttable presumption. *Kodak,* 504 U.S. at 470, 112 S.Ct. 2072. This was the "second best alternative" that Kodak argued and the position asserted by the United States government as *Amicus Curiae.* 504 U.S. at 467 n. 11, 112 S.Ct. 2072. In the general case, a lack of market power in a competitive pre-market will prevent market power in the derivative aftermarkets. This general economic presumption, if unrebutted, would allow summary judgment for the defendant. Under this rebuttable presumption, "the burden would then shift to the plaintiffs to 'prove ... that there is a specific reason to believe that normal economic reasoning does not apply.'" *Id.* In the *Kodak* case, the defendant offered no evidence at all, whereas the ISO plaintiffs submitted substantial evidence inconsistent with the general economic presumption. As noted above, these included supracompetitive prices for the tied package, price discrimination in favor of the potentially "more knowledgeable" purchasers of

the equipment that did their own service and an increase in service prices for Kodak customers, but no evidence that Kodak equipment sales dropped. 504 U.S. at 477, 476 and 472, 112 S.Ct. 2072 respectively. Finally, there existed significant information and switching costs which "costs could create a less responsive connection between service and parts prices and equipment sales." *Id.* at 473, 112 S.Ct. 2072.

The Areeda authors argue that *Kodak*'s majority did no more than determine that in light of this evidence produced by the plaintiffs and the lack of a fully developed record, the plaintiffs for purposes of Rule 56(c) had come forward with sufficient evidence to allow a jury to rebut the presumption that competition in the foremarket will "preclude[ ] any finding of monopoly power in derivative aftermarkets." *Id.* at 466, 112 S.Ct. 2072.

### 2. *Kodak* and Franchises:

Because consumer choices to buy a product or other item such as a franchise always limit future choices because of a "lock-in," the authors suggest that market power should be determined at the time "the customer became committed to the tying arrangement." Areeda, et al., at 147, ¶ 1740. In considering the franchise situation under *Kodak,* the Areeda treatise notes that in the foremarket a franchisor's trademark generally carries no market power at the outset of the franchise relationship.[45] When the tie-in is established at the beginning of the relationship, making that the relevant time to measure market power, the franchisor has no additional power to induce this tie.[46] Aree-

---

**45.** In another section, the Areeda authors note:

[W]e should not presume that fast-food restaurants lie in different markets from all other restaurants or that separate markets should be defined according to menus of hamburgers, chicken, seafood, pizza, and so on. While some courts defined narrow franchise markets, most of the franchise tying cases preceded the Supreme Court's insistence on genuine proof of power.

The standard market definition methodology requires proof that fast-food restaurants or those with particular fare could maximize profits by charging significantly more than the competitive level. Such proof would be rare.

If, as seems likely, the pre-fast-food restaurant business was highly—perhaps even perfectly— competitive, then fast food must have made its way with better quality (in terms of speed or consistency) or lower prices. Were prices to rise significantly, many patrons would return to nonfranchised fast-food establishments— diners, coffee shops, "family" restaurants, and the like. Hence we would presume, for example that fast-food pizza franchises are not a market.

Areeda, et al., at 101, ¶ 1737e3 (footnote omitted).

**46.** This is clearest when the tying and tied products are purchased simultaneously, but the authors contend "[t]he same can be true for con-

DA, ET AL. at 145, ¶ 1740c2. Yet, they note that a franchisee may become "locked in" after investing in realty, training, advertising, and development of goodwill for the franchise product, which sunk costs may not be "wholly or even partially useful for any alternative occupation." *Id.* at 146. Thus, a later threat to withdraw the trademark can acquire coercive force after the franchisee invests substantially and irreversibly in developing the franchise. Nonetheless, courts should presumptively assess the defendant's power at the outset of the relationship in the absence of those special and limited circumstances in which the *Kodak* factors might apply.

Of greater significance is the authors' position that:

> We should also measure power at the outset, even when the original trademark license does not specify the prices for the consumables that the franchisee is obliged to take, though it allows him to terminate the relationship if he objects to future prices. To be sure, the defendant might raise the price of the tied product above (or further above) market prices once a lock-in inhibits walking away from the franchise. Nevertheless, the tie did arise simultaneously with the trademark license, and franchisees knew at the outset that the tie allowed the franchisor to force them to choose between sacrificing nonsalvageable investments and accepting very high prices for the tied product. Moreover, all the justices in the *Kodak* case seemed to agree that a generally known commitment, de

facto or by contract, to purchase the second product from the defendant implicates the defendant's power (if any) at the time that commitment was made.

*Id.* at 147, ¶ 1740 (footnotes omitted).

The authors acknowledge that when the tie is imposed after the franchisee has become locked in, *e.g.* at a renewal period for the franchise license, the

> franchisee's nonsalvageable "switching" costs in abandoning the franchise, if substantial, might induce him to accept a tie ... that he would have rejected at the outset of the franchise.... Measuring the defendant's power at the time this tie was entered makes switching costs relevant.[23]

> [23] While this franchisee could have initially foreseen that he would become vulnerable to future ties, the cost of obtaining and processing the relevant information could be high....

*Id.* at 148.[47]

Areeda, et al. note that there is a substantial difference on whether the defendant's policies are generally known before the buyer commits to the product.

> Thus the key difference ... is the degree of knowledge conveyed by the defendant or his rivals or otherwise reasonably available to the buyer when [the product] is purchased.

*Id.* at 151. While this portion of the Areeda text deals with a situation involving the sale of machines and repair parts with possible tie-ins for service, the authors make it clear that their analysis would be similar for a

---

tinuing future purchases. For example, suppose that the defendant conditions a permanent trademark license on the franchisee's agreement always to buy consumable supplies ... from the defendant at prices specified in the original contract,"even when these prices exceed market prices. *Id.* at 146–47. The franchisee can compare this premium in payment to the cost that would be necessary to obtain a rival franchise. The fact that the franchisee may later become locked in is irrelevant because he was not yet locked in when he accepted the tie.

47. The authors later stress that the case for market power being measured after lock-in is particularly strong when there is a change in policy and "[i]f that [new] policy creates a tie...." *Id.* at 151 n. 37. The authors also note that in order to show that a lock-in is "substantial," there

must be proof of substantial switching costs involving unrecoverable value *and* that this unrecoverable value in sunk costs exceeds the alleged above-market premium to be paid for the tying and more particular the tied product for the remaining useful life of the primary product or investment. *Id.* at 152. The authors reason that "[e]ven if switching costs allow the defendant to extract some premium, it may be too small to constitute the substantial power that antitrust law usually demands." *Id.* at 153. The authors also point out that a defendant can gain little from trying to exploit "locked in" customers unless they are a substantial group as well as a substantial share of all of defendant's customers unless the defendant can price discriminate in favor of new customers that the defendant wishes to attract.

franchise situation.[48] When lifecycle pricing is not predictable and a claimant knows that certain goods are only available from the defendant at the time the contract is entered, the buyer

> can protect himself by purchasing elsewhere or by conditioning his purchase from the defendant on such contract guarantees as market prices for [the item] or prices no higher than those charged the defendant's most favored customers.

*Id.* at 151.

The author also noted that a defendant's own market situation downstream may put "a ceiling on a locked-in customer's exploitability." If the locked in customer is already selling his or her product at a short-run marginal cost, they cannot pay an above-market price to the seller on an ongoing basis and survive in the market.[49]

With respect to the degree of ignorance in a pre-contract situation that the buyer must have, the authors note:

> [A]ll that the buyers need to know when making an initial purchase is that they may be at risk with respect to repair-part pricing or that the seller knows more than they do about the lifecycle price to them. There is no significant market failure unless (a) buyers fail to know that and (b) the relevant uncertainties cannot be made the subject of prior bargaining.

*Id.* at 154. The authors add that "the knowledge required for this purpose need not be perfect ..." *Id.* The knowledgeable machine buyer or franchise trademark licensee

> has both the incentive to learn the lifecycle price of that purchase and the ability to learn—from the market, the defendant, or his own experience—the future volume and price of supplies and services needed to

maintain the machine over its useful life. This knowledgeable customer cannot be exploited via high prices on unique repair parts because he took them into account in comparison with rival brands and their lifecycle prices when he bought the machine.

*Id.* at 155.[50]

> Knowledge does not eliminate ... switching costs. Rather, it means that the estimated [future] costs ...—including the risk that the defendant may change its ... policies—are taken into account at the time of its initial purchase in comparison with rival [opportunities] ....

\* \* \* \* \* \*

For such contracts, both theory and all the justices in *Kodak* agree that the defendant's power would be measured in terms of his machine (or trademark) relative to reasonable substitutes at the time of the initial purchase regardless of any subsequent switching costs.

> While the knowledgeable customer's estimate will be less precise than an explicit contract specifying lifecycle payments, the perfectly knowledgeable customer recognizes his uncertainty about the future, quantifies the post-lock-in risk of future exploitation and its magnitude, and discounts that quantity to the present when he chooses the defendant's machine in preference to rival machines.

*Id.* at 155 (footnotes omitted).

The Areeda authors conclude "very imperfect knowledge suffices to date the tie from the outset of the parties' relationship and to make decisive the defendant's assumed lack of power in the interbrand [foremarket]." *Id.* at 157.

---

48. *See* Areeda, at 155 n. 47.

49. In the franchise situation, even where the franchisor is no longer selling new franchises and is merely profiting off of royalties and the sales of goods and services to existing franchises, the franchisor has little incentive to put these franchisees at a competitive disadvantage with respect to their competitors and to put them out of business because that will reduce the defendant's profit and possibly put the defendant out of business altogether.

50. The authors note the rare exception to this is the liquidating defendant who has no need to maintain a reputation to continue foremarket sales, or to maintain the goodwill of existing aftermarket customers, or the individual who has the capacity to price discriminate in favor of the new customers and against the old customers to allow the new customers to protect themselves from post-contract exploitation. *Id.* at 155 n. 48.

A buyer knowing an announced or generally understood restrictive policy, or even a buyer who could reasonably anticipate the risk of such a future policy can compare whether similar risks were faced with alternate competitors in the foremarket, or whether contractual protections would be available in the contract with the seller. Thus, the authors suggest that in order to invoke the *Kodak* narrowed market definition for application of the *per se* tie-in rule,

> the plaintiff must prove that they are "ignorant" in the sense that they could not reasonably anticipate later "exploitation" when they bought the machine or entered the dealership or franchise and that they could not reasonably protect themselves in the marketplace by obtaining, say, contract guarantees or warranties from the defendant or his rivals.

*Id.* at 158. Again the authors suggest that the courts should look to the ignorance of the "reasonable buyer" rather than the particularly foolish buyer. "[A] reasonable buyer standard considers the relative ease and cost of acquiring the necessary information or protection relative to the potential savings." *Id.*

V. ANALYSIS:

A. *Facts Known to Franchisees Signing the mid–1990 Franchise Agreement:*

The starting point for determining what class plaintiffs knew pre-contract is what was in the mid–1990 Franchise Agreement and Offering Circulars. In section V.A. of this August 1990 Franchise Agreement, the franchise owner acknowledges that LCE owns the "Little Caesar" trade name and affiliated trademarks and service marks. The franchisee "shall use such applicable trademarks, service marks, trade names and copyrights ("Proprietary Marks") only in the manner and to the extent specifically licensed by this Agreement." (Franchise Agreement, Section V.A.)

The franchisee also acknowledges in section V.B. that any goodwill that arises "in the future through the activities of any Licensee of LITTLE CAESAR, inures directly and exclusively to the benefit of LITTLE CAESAR."

In section V.D., the franchisee covenants:

4. To use only the recipes, methods and trade secrets developed by LITTLE CAESAR and licensed hereunder in the preparation of pizza and other food items sold or offered for sale to the public by Franchise Owner.

5. To feature, sell or offer for sale only such menu items and other products or services as shall first have been approved in writing by LITTLE CAESAR as consistent with the image and quality standards of the LITTLE CAESAR System . . . .

. . . . .

7. To use only paper products including carryout containers which strictly conform to the design and quality specifications of LITTLE CAESAR as to size, quality, quantity, texture, absorbency, strength, and appearance and other characteristics in compliance with section VII of this Agreement as may from time to time be prescribed by LITTLE CAESAR's operating manual. *Said containers shall bear various Proprietary Marks of LITTLE CAESAR.*

(Emphasis supplied.)

Section VII dealing with *"SUPPLIES,"* notes that except for secret spices and dough mixes which

shall be purchased only from LITTLE CAESAR or its designated distributor, Franchise Owner may purchase foods, ingredients, and other supplies, including paper goods as approved by LITTLE CAESAR from any source of its choosing, provided that said source has been previously approved as a supplier by LITTLE CAESAR in accordance with its standard practice and the food, ingredients and supplies adhere to LITTLE CAESAR's specifications and quality standards. *With the exception of suppliers of signage and other products bearing the LITTLE CAESAR name and Proprietary Marks,* Franchise Owner may request that LITTLE CAESAR place a supplier on LITTLE CAESAR's approved supplier list. LITTLE CAESAR shall not deny approval of

any item which complies in all material respects with LITTLE CAESAR's specifications. The cost of any testing of said items by LITTLE CAESAR shall be borne solely by Franchise owner.

(Emphasis supplied to note the exclusion of logoed goods.)

The Offering Circular adds:

LITTLE CAESAR does not require the Franchisee to purchase or lease any goods, services or supplies from a specified source, with two exceptions.

The formula for the LITTLE CAESAR spice mix and the Pan! Pan! Pizza dough mix are trade secrets that LITTLE CAESAR will not disclose to the Franchisee.

\* \* \* \* \* \*

*OBLIGATIONS OF FRANCHISEE TO PURCHASE OR LEASE IN ACCORDANCE WITH SPECIFICATIONS OR FROM APPROVED*

*SUPPLIERS*

It is important to LITTLE CAESAR that, to the greatest extent possible, there be uniformity throughout the LITTLE CAESAR franchise system with respect to format, methods of operation, and food preparation, taste, texture and quality of the products sold to the public.

\* \* \* \* \* \*

In connection with these products, LITTLE CAESAR has specific standards of quality and product identity which apply to the principal ingredients of all pizza and other products used and sold in the LITTLE CAESAR franchise system. As to food products, these standards and specifications apply to flour, oil, sauce, cheese and other products associated with the various items that the public likes to have put on its pizzas. . . .

\* \* \* \* \* \*

As in the case of food products, paper goods come in varying quality ranges, some of which are less suitable for LITTLE CAESAR Restaurants than others, and many of which bear LITTLE CAESAR proprietary marks or symbols specifically imprinted thereon for use in LITTLE CAESAR establishments. There are, therefore, also grade or quality standards for these non-food products.

These food and non-food product specifications are maintained at LITTLE CAESAR's principal office and are available on request for examination. The Franchisee is required (Franchise Agreement, Section VII.) to use only those products which comply with these food and non-food standards and specifications in the operation of the franchise.

\* \* \* \* \* \*

Except in the case of LITTLE CAESAR trade secret spice mix and dough blend mix referred to in the immediately preceding section of this Offering Circular, the Franchisee is free to purchase its supplies and equipment for use in the franchised business from any source of the Franchisee's choosing, provided that the Franchisee can demonstrate that the supplies and equipment conform to the specifications pertaining to them in each instance. The demonstration of compliance with LITTLE CAESAR specifications and standards will be by laboratory analysis and, since it is the responsibility of the Franchise to demonstrate compliance with such standards and specifications, all costs associated therewith shall be paid by the Franchisee. Where a Franchisee has successfully demonstrated that a product conforms to LITTLE CAESAR product and ingredient standards, that product and supplier shall be kept on an approved list by LITTLE CAESAR, which list shall be available for inspection on demand. . . .

\* \* \* \* \* \*

Blue Line Distributing, Inc., a wholly-owned subsidiary of LITTLE CAESAR, to whom LITTLE CAESAR has granted an exclusive license to contract for the manufacture and distribution of certain supplies, derives substantial income from the sale of supplies to Franchisees as well as to LITTLE CAESAR-owned Restaurants. The audited financial statements of Blue Line Distributing, Inc. are consolidated with the audited financial statements of LITTLE CAESAR for the years ended December

31, 1986, 1987, and 1988 which are included in the financial information section of this Offering Circular. The profit earned by Blue Line Distributing, Inc. does benefit LITTLE CAESAR.

The 1995 Franchise Agreement has removed the restriction on the right of a franchisee to seek an alternative supplier of logoed goods that existed in section VIII of the mid–1990 Franchise Agreement. The Offering Circular listed the names, addresses and phone numbers of over 500 Little Caesar franchisees owning in excess of 1,500 carry-out outlets in 1989. The December 31, 1988, financial statements show LCE's earnings included $225 Million from its food service sales compared to $30 Million in royalties and franchise fees. The Offering Circular also disclosed that LCE owned 520 additional carry-out outlets.

### B. *Other Facts Relevant to a Kodak Lock-in Market:*

In the Report on class certification that was adopted by this Court, it was noted that:

LCE in June 1989 entered into a licensing agreement that gave Blue Line the exclusive right to distribute logoed products to franchisees ... those items that bear the Little Caesar registered mark, such as items on logoed paper products

(bags, cups, napkins), packaging, and condiments such as salad dressing . . . .

172 F.R.D. at 240.

In August 1990, LCE began using the form Franchise Agreement noted above. The earlier decision noted:

The mid–1990 Franchise Agreement makes it clear that the franchisee can purchase logoed goods from an alternate source if one is approved other than Blue Line. If no other distributor of logoed goods is approved, however, the franchisee cannot ask that an alternate distributor of these goods be approved.

*Id.* at 243.

This contract expressly prohibits the franchisees from requesting an alternate supplier of logoed paper products in a market in which Blue Line was at the time the sole distributor of such products.

While the Little Caesar/Blue Line exclusive license agreement was not known to the parties at the time, its consequences were apparent in the marketplace at least to the extent that no other entities had produced or attempted to distribute logoed paper products to Little Caesar franchisees.

*Id.* at 260.[51]

Thus, franchisees with a mid–1990 franchise agreement who chose to continue

---

**51.** In reviewing a submission from defendants' January 31, 1995, Second Supplemental Brief Opposing Class Certification (which dealt with plaintiffs' initial class certification for pre- and post–mid–1990 franchisees), Exhibit 2 shows that as of August 1990 Blue Line had opened warehouses and began acting as a distributor in 10 of the current 16 regions. The other regions were served by LCE approved associate distributors. Four of the six distribution warehouses Blue Line opened between August 1990 and December 1992, when it opened its final warehouse, were more conveniently located warehouses for Little Caesar franchise units already being serviced by Blue Line from more distant warehouses. Yet, two of the warehouses opened after August 1990 (Stockton, California in September 1991 and Fife, Washington in July 1992) did begin servicing 243 franchise units who before then bought from associate distributors Leprino Foods and Food Service of America, respectively. Also, in November 1990, Blue Line began servicing 107 franchise units in the Kansas City area from its Dallas warehouse, whereas before then these units bought supplies from associate distributor Pegler Sysco. There is no evidence in the record

of how many owners of these 350 units signed a mid–1990 Franchise Agreement at a time prior to Blue Line becoming the sole distributor in their area. Those class members who did sign the mid–1990 Franchise Agreement at a time they were still being serviced by an associate distributor are hereinafter referred to for purposes of identification as the "Associate Distributor Class Members." Plaintiffs' experts in their December 1996 declaration indicate there were 2,440 independent Little Caesar franchisees as of September 1993. By the fall of 1992, nearly all regions of the country were being served by Blue Line. Thus, it is likely that the substantial majority of Little Caesar franchisees signing the mid–1990 Franchise Agreement did so at a time when Blue Line was the sole distributor in their region. The associate distributor franchisees who signed the mid–1990 Franchise Agreement at a time that an Associate Distributor operated in their region are in the certified class. Yet, much of my analysis in this Report of what was "generally known" pre-contract—which is necessary to do a *Kodak–PSI* determination of how the tying market is defined—will not apply to these Associ-

purchasing product *A* (continuing as a Little Caesar franchisee) knew they were required to continue buying paper products from Blue Line and could not seek an alternate supplier of such goods.

*Id.* at 259.[52]

In the present case, the buyer's state of mind of proposed class members knew there were no competitors offering logoed goods or other supplies needed to operate a franchise. The reasonable franchisee with the post–mid–1990 Franchise Agreement also knew (even Gary Smith reasonably must have known) that he had contractually given up the right to seek an alternate supplier of logoed goods. All of this was because of defendants' intended acts.

*Id.* at 265.[53]

The earlier Report notes evidence that would support a finding that LCE's 1989 Exclusive Licensing Agreement and its mid–1990 modification of its Franchise Agreement were part of a plan to use LCE's proprietary rights and its trademark and copyright protections over logoed goods to improve its competitive position against other potential distributors once Blue Line entered a regional market.

[In a] September 22, 1988, memorandum from Deal to Ilitch dealing with Blue Line's expansion into the southeast United States where it would compete with the existing distributor, PYA Monarch, Deal noted that the approach used in the past of merely disapproving the competitive distributor would not work because PYA had been doing a credible job in the southeast

at the time. It appears another competitor, Sysco, would be disapproved. In dealing with the franchisees, the tone of the announcement was to state an expectation that the franchisees would swing over to Blue Line or "in the PYA area, we are going to fight them (albeit with a stacked deck)," apparently referring to the exclusive access to logoed products that Blue Line would have. Plaintiffs' Exh. 8 at p. 1.

*Id.* at 260. Lockridge August 31, 1995, Declaration, Ex. 8, Docket # 195, filed September 1, 1995, in support of Second Motion for Class Certification (hereinafter "Lockridge August 1995 Declaration").

In an internal memo of March 27, 1989, from David Deal to LCE Board Member Jay Bielfield, he notes his work with the Director of LCE's Legal Department:

As you are aware, Gil Simon and I have been working on a number of issues to more effectively posture Blue Line vis-a-vis its competition, for example, we are proposing an agreement with Little Caesar whereby Blue Line becomes the exclusive distributor of all trademarked items.

Perry April 1, 1997, Declaration, Ex. 3 at p. 2, Docket # 257, filed April 1997, in support of Plaintiffs' Second Supplemental Brief in Opposition to Defendants' Motion for Partial Summary Judgment (hereinafter "Perry April 1997 Declaration"). This memo also notes that it was Blue Line that was principally involved in approving alternative distributors.[54] Mr. Deal acknowledged that the 1990 Franchise Agreement was changed "[b]ecause we wanted to conform the Fran-

---

ate Distributor Class Members. They will be considered separately.

**52.** Again, for the Associate Distributor Class Members, as noted in footnote 51 above, this would not be apparent to them because they were buying their logoed and other goods from an associate distributor, not Blue Line, when they signed the mid–1990 Franchise Agreement.

**53.** As noted in the earlier Report, the critical question for antitrust purposes is whether these "intended acts" "were legal competitive behaviors" or "impermissible restraints on the market choice of consumers or on alternate potential distributors' ability to enter the market and compete with Blue Line" and " ... whether the

actions of defendants impermissibly dissuaded potential alternate distributors from entering the market or from competing as effectively with Blue Line ...." *Id.* at 265–66. These questions were reserved in the class certification motion. "While plaintiffs may ultimately fail to prove defendants' actions were illegal, or fail to prove any effect on prices, or fail to prove the tie-in of logoed products leveraged a larger tie-in, all of these are merit questions that should not affect the class certification question." *Id.* at 266.

**54.** "Approved Distributors and Approved suppliers: While we are moving toward Little Caesar involvement in approving distributors through the Franchise Option Committee, this remains principally as a Blue Line function." *Id.*

chise Agreement to the business intent we had to control distribution of our trade-marked goods." Lockridge July 28, 1997, Declaration, Ex. 1, Docket # 265, filed July 29, 1997, in support of Plaintiffs' Motion Pursuant to Fed.R.Civ.P. 54(b) to Amend the August 7, 1995, Order Granting Partial Summary Judgment on the Tying Claim of Plaintiffs Hennessy and Fields (hereinafter "Lockridge July 1997 Declaration"); Deal November 30, 1994, Deposition at 186; Lockridge August 1995 Declaration, Ex. 14.

In a November 12, 1991, memo from David Deal to David Kushner, he notes:

> The original intent of the agreement was to provide an exclusive arrangement for Blue Line to distribute paper products and other supplies to Little Caesar restaurants so that Little Caesar would be able to exclude third parties from these offerings. It was not contemplated at that time to put in place an even broader agreement to involve products that do not ultimately find their way to the customer, such as uniforms, signage, etc.
>
> Plaintiff's Exh. 21.

172 F.R.D. at 261. Lockridge August 1995 Declaration, Ex. 21.

When Blue Line entered the Atlanta area in early 1989, the associate distributor PYA Monarch did not stop competing as apparently occurred with associate distributors in other areas.

> Little Caesar withdrew the rights to distribute logoed paper products from at least one of the prior competing distributors, PYA Monarch, and . . . this was known to be a strategic business tactic that made it more difficult for competing distributors to compete with Blue Line and satisfy the franchise preferences for one-stop shopping.

172 F.R.D. at 260. Mr. Deal wrote Michael Ilitch on January 9, 1989:

> Atlanta construction is on schedule and we continue to hold to our February 1st date. A decision will be made by week's end whether this date is final so we can notify franchisees in the area and cut PYA off from our proprietary products and national contracts.

> In retaliation, PYA/Schloss & Kahn continues to prospect our Florida franchisees. Bob Brewer (Tallahassee) has moved three stores and effective today, John Kronberg is moving 11 Orlando stores to PYA. In both cases we have notified the distributor that this behavior is unauthorized and could cause them loss of approved status. While these losses are unsettling, it still remains to be seen whether PYA will be competitive once they are denied access to our contracts and proprietary/trade-marked products.

Deal December 2, 1994, Dep. Ex. 275; Lockridge August 1995 Declaration, Ex. 10.

On January 17, 1989, Mr. Deal again wrote Mr. Ilitch, noting:

> The Atlanta warehouse opening date has been finalized as February 8th. A letter of announcement has gone out to our franchisees and Matt, Rod Bathurst (our warehouse manager) and I will be making sales solicitation calls over the next few weeks.
>
> In addition, it is our intent to proceed with the program we discussed in Ft. Lauderdale whereby our approved suppliers are advised that PYA may no longer purchase product under our national contracts and they will also be denied access to our super-proprietary items of square dough mix, spice mix and logoed packaging. We will also deny them access to our sauce due to very tight supplies.
>
> This approach, which will require those franchisees to place twice weekly food orders in the event they choose not to give us all of the business, is bound to generate some degree of resentment among certain franchisees. Over time, however, I believe that they will not begrudge us our right to totally control distribution of our proprietary items and this move will put us in the best possible competitive situation.

Deal Dep. Ex. 274; Lockridge August 1995 Declaration, Ex. 9.

This strategy had been planned since the prior fall. In a September 22, 1988, memo, Mr. Deal wrote Mr. Ilitch about a planned meeting with their franchisees in Ft. Lauderdale:

I do not expect PYA to go quietly. They will battle us for the business. To maximize our penetration with the franchisees I am suggesting the following approach:

1. Phone call from me to the top eight to ten franchisees prior to the regional meetings advising them of Blue Line warehouse announcement to be made at the meeting.

[Handwritten] Tone of the announcement to franchisees -

— Say nothing unless asked about PYA still approved & Sysco not.

— Expectation that they will all swing over or, in the PYA area we are going to fight them (albeit with a stacked deck)?

Deal Dep. Ex. 273; Lockridge August 1995 Declaration, Ex. 8.

At his deposition, when asked to explain what he meant when he said he was going to fight PYA Monarch "albeit with a stacked deck," Mr. Deal admitted: "That we were going to leverage every business advantage we had seen." *Id.* at 400. He later noted that the competitive strategy intended "Pushing our business advantages within the limit of the law." Id. at 404. He noted that one of those advantages was the fact that Blue Line had exclusive access to logoed items. 172 F.R.D. at 261; Lockridge August 1995 Declaration, Ex. 14.

At his deposition, David Deal also acknowledged that PYA Monarch was denied access to logoed goods so that Little Caesar franchisees remaining with them would have to take two deliveries, one for logoed goods from Blue Line and one for other items from PYA Monarch. Lockridge July 1997 Declaration, Ex. 1, Deal December 1994 Deposition at 408. Blue Line was "leveraging" its exclusive right to distribute logoed products to develop a competitive edge. *Id.* at 76, 378, 388–89, 400, 404.

While the PYA Monarch early 1989 situation was prior to the limitations period for

this class litigation,[55] plaintiffs have submitted other evidence which they contend is relevant to LCE attempting to extend its leverage over logoed goods against potential rival distributors in order to maintain its tie over the entire "market basket" of goods franchisees need to continue as a Little Caesar franchise.

At the time LCE was granting Blue Line the exclusive license, LCE wrote its suppliers to explain the new system. John Lay, LCE's Vice President for Franchise Operations, wrote Bill Koch of Henri's Food Products on May 16, 1989:

Little Caesar Enterprises, Inc. has granted the exclusive license to Blue Line Distributing, Inc. to allow Blue Line to contract with third parties for the manufacture and production of certain supplies and paper products which utilize the Little Caesars proprietary trademarks. These items include, but are not limited to, carry out bags, wrappers, dishes, napkins, cups and boxes, salad containers, dressings and all Little Caesar logoed products.

Blue Line will be the sole entity to enter into any agreements with third party manufacturers to produce and distribute Little Caesar logoed products as outlined on attachment A.

Blue Line will be responsible for purchasing these Little Caesar logoed products for sale and distribution through Blue Line Distributing centers and for direct shipments to authorized Blue Line Associate Distributors.

Effective May 17, 1989, Blue Line will accept orders from Authorized Associate Distributors and place shipment orders with you, the manufacturer, for direct shipment to the designated Authorized Associate Distributor's distribution center. No manufacturer of logoed products should accept shipment requests or purchase or-

---

**55.** PYA Monarch and Schloss & Kahn stopped competing in the Atlanta area in 1989, and no class claims regarding the mid–1990 Franchise Agreement effecting a tie-in directly involve these former Atlanta associate distributors. These LCE/Blue Line involvements with PYA Monarch are relevant to LCE's motive concerning its more

recent action. It might also be relevant if plaintiffs could prove that these events, coupled with other LCE acts with the statute of limitations period, contributed to alternate distributors not seeking to enter the market and competing with Blue Line after class members were locked in to their mid–1990 Franchise Agreements.

ders direct from any Associate Distributor or anyone else.

Blue Line will purchase the product, give shipping directions, and will pay the manufacturer or supplier invoice for merchandise shipped against the Blue Line purchase orders.

\* \* \* \* \* \*

The cost and pricing of merchandise should NOT appear on any document provided to the Associate Distributors. All costs and pricing will be displayed on correspondence forwarded to Blue Line only.

Lockridge June 9, 1994, Declaration, Ex. F, Docket # 30, filed June 13, 1994, in support of Plaintiffs' First Class Certification Motion. An attachment clearly identified the "LOGOED/TRADEMARKED ITEMS" subject to the exclusive Blue Line license.[56]

Plaintiffs submit a June 15, 1990, memo from David Deal to all LCE approved suppliers of food and packaging notifying them that Blue Line will begin servicing its Salt Lake City area outlets from its existing Denver warehouse, and that the existing Salt Lake City area Associate Distributor, Nicholas & Company, Inc. could no longer purchase under the existing supply contracts nor purchase logoed goods:

From that time, Nicholas must negotiate their own contracts with your company for food and paper products. Nicholas will no longer be authorized to purchase any Little Caesar product under a Blue Line Distributing negotiated contract.

Little Caesar logoed and/or proprietary products CAN NOT be sold to Nicholas by a Little Caesar supplier. All suppliers of Little Caesar logoed and/or proprietary products should call Bob Ames if any or-

ders are placed by Nicholas for shipment beyond June 18, 1990.

Defendants' January 30, 1995, Addendum, Ex. 18 at p. 1, Docket # 127, filed January 31, 1995, in support of Defendants' Second Supplemental Brief Opposing Class Certification (hereinafter "Defendants' January 1995 Addendum").

A June 22, memo from a Jon McClain, apparently with one of the LCE meat suppliers, approved a final ham order to Nicholas on June 29, 1990, and added:

EFFECTIVE JULY 16, 1990 BLUE LINE DISTRIBUTING WILL BEGIN SERVICING ALL LITTLE CAESAR'S UNITS CURRENTLY SERVICED BY NICHOLAS, INC. OF SALT LAKE. NICHOLAS WILL NO LONGER BE AUTHORIZED TO PURCHASE ANY LITTLE CAESAR'S PRODUCTS . . . .

*Id.* at Ex. 18, p. 2.

Later in 1990, when Blue Line began servicing the Kansas City area franchisees out of its existing Dallas warehouse, David Deal on November 20, 1990, sent LCE approved suppliers a similar memorandum regarding Associate Distributor Pegler Sysco.

Effective November 26, 1990 Blue Line Distributing will begin servicing all Little Caesar units currently serviced by Pegler Sysco.

From that time, Pegler must negotiate their own contracts with your company for food and paper products. Pegler will no longer be authorized to purchase any Little Caesar product under a Blue Line Distributing negotiated contract.

*Id.* at Ex. 18 p. 3.

Supplier Tony Alonso on November 23, 1990, forwarded the November 20 Deal

---

56. Slice!Slice! Folding Carton
Single Slice Folding Carton
Bread and Bonus Bread Bags
8, 12, 20# Printed Bags
Baby Pan!Pan!
Single Bags
Double Bags
All Miscellaneous Logoed Bags
Salad Convenience Packs
Salad Containers
Little Caesar Dressings
Cold and Hot Cups and Lids

Crazy Sauce Cups and Lids
Napkins
Straws
Cup Carriers
This Court has earlier noted that the scope of the exclusive licensing agreement applies only to these typed of logoed goods and not to the meats, cheeses, and other supplies on which wholesale packaging the manufacturer or suppliers may stamp a LCE logo to identify them as being LCE specification products.

memo and notified Jon McClain and David McConnell:

> As you can see by the attached memo from Blue Line, effective immediately Blue Line will be servicing all of the Little Caesars units that are currently serviced by Pegler Sysco in Omaha. For this reason, we are no longer authorized to ship Pegler Sysco any authorized Little Caesars product.
>
> By copy of this letter, Jon should delete anyone receiving Little Caesars pricing by teletype, or other means, in the Omaha area. If Pegler continues to request ham, pepperoni, or any other product, let's make sure that Blue Line has been communicated of their request and positively, under no circumstance, are we to sell Pegler Sysco at the same pricing as Blue Line.

Lockridge December 23, 1996, Declaration, Ex. 3, Docket # 249, filed December 27, 1996, in support of Plaintiffs' Brief in Opposition to Defendants' Motion for Partial Summary Judgment (hereinafter "Lockridge December 1996 Declaration").

A June 12, 1991, form letter from David Deal to the producers of its logoed goods explained that only Blue Line can authorize manufacturing and/or distributing of logoed materials:

> This is just a reminder that our franchisees do not have similar authority. In fact, if one of our franchisees contacts you directly asking you to produce items bearing LCE's proprietary marks, we are asking you to decline their request and contact the appropriate purchasing personnel as soon as possible.

Perry April 1997 Declaration, Ex. 4.

To follow up on a July 3, 1991, telephone call to Kathy Campbell of LCE's Associate Distributor Leprino Foods in California, Matt Ilitch wrote her an official letter informing her that Blue Line would begin distribution operations in California and Nevada from a warehouse in Stockton, California, by mid-September 1991. He added:

> Please know that Leprino Foods did not fail as our associate distributor. Rather, it is part of the Little Caesar master plan to control distribution of Little Caesar brand products through its Blue Line distribution division. In fact, of all of our past and present associate distributors, Leprino Foods' reputation is at the top.

Lockridge August 1995, Declaration, Ex. 7. He concluded that Blue Line would purchase unsold LCE specification inventory from Leprino Foods when Blue Line began operations in California unless "Leprino decides to retain the Little Caesar business."

In a November 26, 1991, internal memo to Al Thompson regarding franchisee Chuck Walls' request for an alternate distributor in the Madison, Wisconsin, area, Matt Ilitch notes:

> There is no formal approval process for outside food and paper distributors when there is an existing Blue Line distribution center in a market area.
>
> If a distributor, however, wants to compete with Blue Line they would be on their own to negotiate their pricing program. To get competitive pricing from our vendors they would have to meet minimums which I don't think the Chuck Walls stores would satisfy. In any event, Blue Line will not reveal to any distributor, information about Little Caesar products and how to get them without first establishing that Blue Line has not fulfilled both pricing and service obligations.

Lockridge December 1996 Declaration, Ex. 4.

Many of the submissions plaintiffs assert are relevant to the present motion are LCE's actions in response to plaintiff, and class representative, Gary Smith's 1992 failed effort to have LCE approve AmeriServ as an alternate distributor out of its Atlanta facility. Gary Smith operates three Little Caesar outlets in the Jacksonville, Florida, area. 895 F.Supp. at 887.

On April 9, 1992, Gary Smith wrote certain LCE approved suppliers on A.L.C.F., Inc. letterhead:

> On behalf of A.L.C.F., Inc., (An Association for the Little Caesars Franchises), I hereby authorize the AmeriServ Food Company to obtain pricing for all Little Caesars propriety [sic] products into their Atlanta, Georgia and Charlotte, North Carolina facilities.

Defendants' January 30, 1995, Addendum, Ex. 15, p. 3.

An internal memo from Mr. Deal to Mr. Ilitch on April 20, 1992, states:

It now seems clear that AmeriServ is going to attempt, with Association support, to make a competitive play for our franchise business. Therefore I want to lay out my recommended strategy for addressing this challenge. Simply put, this strategy is grounded on the one hand in pushing our legal advantages to the limit while, on the other hand, upgrading our service commitment and adopting a more aggressive pricing approach. Key elements of this plan would include:

1. A hard-line position with supplier and ALCF that no information can be provided to AmeriServ until they have signed a confidentiality agreement and passed a first blush inspection. This will force AmeriServ to "come in through the front door."

2. Notification to all suppliers that AmeriServ will not have access to our national contracts.

\* \* \* \* \* \*

The result of these elements will be to put us in the best competitive position and also require the stores to take two deliveries per week—one from us and one from AmeriServ. I am hopeful, that, over time, they will see that this inconvenience is not giving them any significant benefit. This was a fairly significant factor in our ability to wear down those stores that initially wanted to continue with PYA Monarch several years ago.

\* \* \* \* \* \*

We must move to modestly reduce our margins on items we will be competing on. At this time, it is difficult to really know how good our pricing is. However, I do think it is high enough that we can be undercut [hand written insert] and AmeriServ still operate profitably.[end of insert] A percent or two we could respond to, but if they get really aggressive we run the risk of losing the credibility we have worked so hard to regain. To minimize the risk of this, I think we need to gradually move our margins down over the next two to three months, particularly in the southeast. Pricing would be adjusted on the high visibility items such as cheese, meats, boards and flour. Phasing this in over several months will reduce its visibility. I am suggesting price reductions which would lower our margin by 1.0 to 1.25 percentage points out of the Atlanta, Orlando and Greensboro, with reductions of about one-half that amount in other centers. This will probably not be enough to face down a competitive onslaught, but will reduce the attractiveness of our business and keep us within the credibility range.

Lockridge August 1995 Declaration at Ex. 11.

In response to Gary Smith's April 22, 1992, letter written as President of Smith Family Foods, Inc. requesting a list of approved suppliers, David Deal wrote on May 7, 1992, that the approved supplier list was sent to all Little Caesar franchisees in March 1990, and had not been updated since then. In reference to Smith's assertion concerning logoed goods, David Deal stated:

In your April 22nd letter, you refer to the Franchise Agreement and state that you have the right to purchase supplies, including paper goods, from any source of your choosing, provided that source has been previously approved by Little Caesar as a supplier. Please note that Section VII of your Franchise Agreement reads, in part that:

"With the exception of suppliers of . . . products bearing LITTLE CAESAR name and Proprietary Marks, Franchise Owner may request that LITTLE CAESAR place a supplier on LITTLE CAESAR'S approved supplier list."

Please be advised that Blue Line is the sole approved supplier of paper products containing the Little Caesar name or proprietary marks. It is my understanding that under the Franchise Agreement you do not have the right to request that any other suppliers be approved for those products.

Alterman September 29, 1995, Declaration, Ex. 4, Docket # 204, filed October 2, 1995, in support of Defendants' Response to Plaintiffs' Second Motion for Class Certification.

On May 14, 1992, David Deal for LCE responded to an April 21, 1992, letter and telephone contact from William Burgess, President and CEO of AmeriServ Food Company.

> In connection with your effort to obtain price quotes from approved suppliers, we have the following policy. Our specifications are proprietary and confidential, as is the price that Blue Line pays to the suppliers. We have reminded suppliers that they are not authorized to give out this information. We have no position as to you discussing potential prices with approved suppliers that they would charge to you if you were an approved distributor. Such discussions are presumably part of your source review. Please note, however, that logoed items, Pan!Pan! Dough Mix and our Spice Blend must be purchased from Blue Line.

Defendants' January 1995 Addendum, Ex. 15, p. 4.

Written notes of a David Deal oral presentation to a meeting of LCE approved suppliers responding to AmeriServ's and Gary Smith's inquiries state:

> I know that many of our food suppliers have received inquiries from Gary Smith and AmeriServ concerning our products as they attempt to develop alternative distribution to Blue Line. Our position on this is the same as it has been for years when it comes to distribution of our products. I outlined this for all food and packaging suppliers in a letter last month but I want to take this opportunity to restate it:
>
> 1. At this time, AmeriServ is not an authorized distributor for Little Caesars.
>
> 2. We expect all of you to respect the confidentiality agreements you have signed with us that preclude you from releasing pricing on our contracts, product specifications or details on upcoming promotions to anyone other than our approved distributors, and that means franchisees as well.
>
> 3. The contracts that we have negotiated with you are ours exclusively and cannot be drawn against by any other approved distributor or franchisee without our specific approval.
>
> I am not aware of any supplier who has indicated they have a problem in following our direction on these few points. I have also been advised that many of you have been solicited to quote on generic, house-branded products or near-specification substitutions. Whether you choose to quote on these types of products is again up to you. However, I want to remind all of you that we take our specifications very seriously. I have had a conversation with most of you, at one time or another, where you have told me that we use some of the highest quality ingredients in the industry and that if we were willing to compromise here we could lower our costs. Unlike our competition, we have steadfastly ignored this siren's call and we firmly believe it is one of the reasons for our success. So you can quote what you want on generic or house-branded products but we are not going to allow our system to deviate from the quality standards we have adhered to for the last 30 years. None of you should use the knowledge of our specifications to undermine the quality of our products.
>
> However, there appears to be some confusion on whether you can quote prices to AmeriServ on Little Caesar products. The decision to quote is up to you. However, if you supply us with logoed items, Pan!Pan! Dough Mix, or any element of our secret Spice Blend, then you cannot quote prices because these must be purchased from Blue Line. Moreover, no products can be sold to AmeriServ at this time because they are not an authorized distributor.

Perry April 1997 Declaration, Ex. 4.

While plaintiffs have not submitted the May 8, 1992, letter of class representative Gary Smith (apparently written of A.L.C.F. letterhead), they do provide by cover letter of November 7, 1997, the June 5, 1992, response from LCE's Vice Chairman Charles Jones to Gary Smith as President of "SMITH FAMILY FOODS, INC.":

This is in response to your letter of May 8, 1992. I note that your letter was written on ALCF stationary. I have, however, assumed that you were writing that letter in your capacity as a Little Caesar franchisee. Therefore, this responsive letter is written to you in your capacity as a franchisee and not in any capacity you may hold with ALCF.

\* \* \* \* \* \*

With regard to your request that a letter be sent to all approved Little Caesar suppliers regarding AmeriServ, I must, unfortunately, inform you that Little Caesar cannot accommodate such request. AmeriServ is not currently approved as a distributor by Little Caesar. In the event AmeriServ is approved as a Little Caesar distributor at some future date, you can re-raise this request.

Bates # 00371, September 2, 1994, Deposition Ex. 109.

In an internal memo of September 23, 1992, from Mr. Deal to Mr. Ilitch, he notes:

A supplier has just contacted us indicating he received the attached letter from AmeriServ. The letter indicates they may have support from franchisees representing 50–60 units and want quotes on generic products that meet our spec. I believe this is a response to Smith's recent newsletter.

\* \* \* \* \* \*

I feel support is coming from units that would be serviced out of AmeriServ's Atlanta facility which MIGHT include the following franchisees[.]

Mr. Deal then lists Gary Smith, non-class plaintiff Sharon Fields, and fifteen other franchisees who together operated 111 Little Caesar units. Lockridge July 1997 Declaration.

On December 28, 1992, Marketing Vice President Jere Lehr of AmeriServ wrote Gary Smith as President of A.L.C.F., outlining an AmeriServ presentation to be given to Little Caesar franchisees at the upcoming A.L.C.F. convention. Siwek and Nelson August 4, 1994, Declaration, Docket # 59, filed August 4, 1994, in support of Plaintiffs' Motion for Class Certification.

A January 21, 1993, internal AmeriServ memo from Marketing Vice President Lehr noted:

Attached is the final version of the presentation that was made to the A.L.C.F. group. The program is very exciting to the franchisees, but until someone in the organization take[s] a stand for their contract rights against the corporation, we will not be able to purchase/stock logo products. Without the logo products, it will be very difficult to make a successful program.

The A.L.C.F. attorneys were present and discussed options with the franchisees, but at this time they did not agree on a plan for proceeding. It is going to continue to be a slow process!

Turnbull October 16, 1995, Declaration, Ex. 19, Docket # 206, filed October 16, 1995, in support of Plaintiffs' Reply to Defendants' Response to Plaintiffs' Second Motion for Class Certification (hereinafter referred to as "Turnbull October 1995 Declaration").

As noted in the earlier Report:

William Burgess of AmeriServ, in his Declaration of August 3, 1994, noted that:

Without the ability to distribute logoed products as part of the full-line distribution program, it is not economically possible to compete [with Blue Line] because the food items are traditionally sold on very low margins and to achieve an economic blended profit margin, it is necessary to be able to also sell the higher profit paper and packaging.

Lockridge Exh., Burgess Declaration at ¶ 17.

172 F.R.D. at 262. Lockridge August 1995 Declaration, Ex. 2.

### C. *Testimony of Plaintiffs' Experts:*

Plaintiffs' economic experts, Stephen Siwek and Philip Nelson, Ph .D., have provided four declarations relevant to this lawsuit.

Plaintiffs' experts define the "tying product" in the present case as the right to continue operation as a Little Caesar franchise. Siwek and Nelson August 1994 Declaration at 11, ¶ 38. They define the "tied product" as "the purchase of food and non-

food supplies, including at least paper and other logoed products, from Blue Line Distributing, Inc. and/or Little Caesar Enterprises" (noting that Blue Line was merged into LCE in January 1994). *Id.* They note that the LCE franchise agreement requires each franchisee to purchase logoed products, and the franchisees are tied in to buying these products from Blue Line because it is the sole supplier of these logoed goods under an exclusive 1989 Licensing Agreement from Little Caesar. *Id.* Each franchisee has "the contractual right to use qualified distributors other than Blue Line, they had the right to 'shop' the market for distribution services." *Id.* at 14, ¶ 44. They accuse LCE of being involved in anticompetitive activities by refusing "requests by franchisees to approve alternate sources of distribution." *Id.* at 11, ¶ 38e. They assert further that:

> LCE's control over logoed products gives it control over other non-logoed products, since distributors find it uneconomic to distribute non-logoed products without also distributing logoed products. In addition, franchisees find "one stop shopping" for weekly supplies to be efficient.

*Id.* at 12, ¶ 38f. "By retaining only one approved distributor in each area [Blue Line] and by blocking franchisees' access to competitive distributors, LCE excluded competitive sources of distribution throughout the United States." *Id.* at 13, ¶ b.

Siwek and Nelson claim that LCE's and Blue Line's profit margins are higher than those of competitors. Had alternate distributors not been excluded from the market, some franchisees would have negotiated better prices with these alternate distributors than from Blue Line, resulting in competition that would lower the price of the aggregate "market basket" of goods necessary to operate a Little Caesar franchise. This lower profit would benefit not only the franchisees who would wish to switch to a different distributor but also those who remained with Blue Line, who would benefit from the new, more competitively priced, and lower aggregate cost of a market basket of goods necessary to operate a franchise.

The focus of this August 1994 declaration was primarily to show that all of these claims could be established through common proofs for a nationwide class.

In response to the current motion for summary judgment with respect to the certified class of franchisees who have signed mid–1990 Franchise Agreements, plaintiffs' experts prepared a declaration relevant to the definition of market and market power.[57] After analyzing the facts to determine that there is a separate market for the tied products, thus demonstrating that the tying and tied products are "separate products," which is discussed in Section III above, plaintiffs' experts analyze first whether a tie exists for franchisees who have pre-mid 1990 Franchise Agreements, and further whether LCE and its affiliate Blue Line have "market power in the relevant market." *Id.* at 2, ¶ 3. With respect to the former question, they assert that:

> The confidential June 1989 agreement between LCE and Blue Line that gave Blue Line the exclusive right to distribute logoed products had the practical economic effect of preventing "hybrid franchisees" from successfully exercising this right. Put simply, the combination of the Post–Mid 1990 Franchise Agreements, the June

---

**57.** In their December 1996 declaration at p. 4, ¶ 5b, they state:

> Under all Franchise Agreements (both Pre–Mid 1990 and Post–Mid 1990), franchisees are allowed to request approval of third-party suppliers.... While the Franchise Agreements do not specifically define the term "suppliers" as including "distributors," the fact that LCE has historically approved third-party distributors and also indicated that it would approve qualified independent distributors suggests that there is no dispute over whether franchisees (both under the Pre–Mid 1990 and Post–Mid 1990 contracts) had the right to seek approval

of qualified third-party distributors and to expect that these distributors would be approved. Siwek and Nelson December 1996 Declaration at 4–5, ¶ 5(b), referring to Alan Harnisch's June 30, 1993, letter to L.D. Klenda noting that "Little Caesar is prepared to and will continue to review requests to approve other potential distributors, and that each request is individually considered." For purposes of this motion, I will consider that there is no dispute of material fact that each franchisee does have the contractual right to seek an alternate distributor which is derivative from its express contractual right to seek the approval of third-party suppliers.

1989 LCE/Blue Line agreement, and LCE's control over the supplier approval process meant that no third-party distributors of logoed products would be approved without litigation. Since franchisees need logoed products to fulfill their contractual commitments and it is uneconomic to operate as a distributor without access to logoed products, continued operation as a "hybrid franchisee" is tied to the purchasing of distribution services and Goods (including logoed products) from Blue Line.

*Id.* at 8–9, ¶ 9.

The bulk of this declaration by plaintiffs' experts deals with the issue of Little Caesar's market power under a lock-in theory. They note that each franchisee invests up front costs in excess of $100,000 to acquire a franchise, which includes a $15,000 initial franchise fee, as well as the leasehold improvements, equipment, initial inventories and other items. These sunk costs, as well as the good will developed by the efforts of a franchisee, locked these franchisees in and exposed them to the franchisor charging supracompetitive prices for goods and services that it controls. *Id.* at 9–10, 12 n. 13. *See also* 12–13, ¶¶ 15–16.

> Franchisees that are "locked in" have only legal remedies, since their contractual commitments, the nature of their investment in their franchise, and the presence of economic rents make it uneconomic for them to close down their franchise operation.

*Id.* at 10, ¶ 12.[58]

The experts note:

> The franchisor will find it profitable to exploit the existing franchisees if the franchisor is not punished legally by the franchisees and if the franchisor does not have to worry that its exploitation of the franchisees will adversely affect its efforts to recruit new franchisees. A franchisor will not have to worry about an adverse effect on the recruiting of new franchisees if potential new franchise recruits are un-

aware of the franchisor's anticompetitive behavior, if the franchisor has grown its franchise operation to the point where it no longer needs to recruit large numbers of new franchisees, if the franchisor lowers its franchise fee to future franchisees that are aware of the explotive behavior, or if the franchisor can convince prospective franchisees that its franchise operation is less risky and more remunerative than was the case when the existing franchisees signed up.

*Id.* at 11, ¶ 13.

Plaintiffs' economic experts acknowledge that:

> Once a Little Caesar franchisee is "locked in" to its contract with LCE, there are two possible factors that could protect it from monopolistic pricing by LCE/Blue Line: (1) LCE/Blue Line will not raise prices to its "locked in" franchisees if it wants to recruit additional franchisees that are not yet locked in and that would be discouraged by supra-competitive pricing by Blue Line. (2) LCE/Blue Line will not be able to raise prices to its "locked in" franchisees if these franchisees have the ability to turn to competitive distributors and suppliers. In this case, neither factor prevents LCE/Blue Line from raising prices.

*Id.* at 13–14, ¶ 17.

While noting they have not yet been able to obtain certain discovery, including detailed LCE and Blue Line financial information, to allow them to understand the defendant's cost structures, over charges, and profitability, they assert that the factual record that they have reviewed contains evidence that LCE franchisees are locked in and that LCE has exploited them by forcing them to use Blue Line and allowing LCE and Blue Line to extract rents from its franchisees. *Id.* at 12, ¶ 14.

Plaintiffs' experts note that while LCE/Blue Line expanded the number of franchis-

---

58. The authors use the standard definition of economic rent as:

> An economic rent is any payment to a factor that exceeds what would be required to bring that factor into existence. Economic rents

arise in various contexts. For example, an economic actor may earn economic rents when he is more efficient than the marginal supplier that determines the market price.

*Id.* at 10 n. 11.

es to over 2,000 by the early 1990's, it now operates at a scale necessary to support national advertising and feels less pressure to grow rapidly. They note that two or three years prior to LCE's President David Deal's deposition of December 2, 1994, Little Caesar had stopped offering new franchises under a moratorium. Deal Dep. at 322; Lockridge December 1996 Declaration, Ex. 6. LCE added some outlets in the early 1990's, although some of these were corporate outlets, and others were purchased back from existing franchisees. *Id.* at 14–15, ¶ 18.[59]

As a result of this lessened demand for new franchises, plaintiffs' experts state that "LCE/Blue Line could be less sensitive to possible adverse reputational effects that might result from disputes with locked-in franchisees than it was earlier in its history." *Id.* at 14, ¶ 18a. Plaintiffs' experts also claim that:

> [F]or "locked in" franchisees the investment in additional Little Caesar's outlets would be relatively attractive compared to the investment in other businesses because they can spread common costs across several Little Caesar operations and because contractual terms such as non-compete clauses, limit their investment opportunities.

*Id.* at 15, ¶ 18b.[60]

Plaintiffs' experts note that under the supply clause of the post-mid 1990 Franchise Agreement the franchise owners could purchase any goods,

> "including paper goods as approved by LITTLE CAESAR from any source of its choosing, provided that said source has been previously approved as a supplier by LITTLE CAESAR in accordance with its standard practice and the foods, ingredients and supplies adhere to LITTLE CAESAR specifications and quality standards. With the exception of suppliers of signage and other products bearing the LITTLE CAESAR name and Proprietary

Marks, Franchise Owner may request that LITTLE CAESAR place a supplier on LITTLE CAESAR's approved supplier list. LITTLE CAESAR shall not deny approval of any item which complies in all material respects with LITTLE CAESAR's specifications." (Section VII of Franchise Agreement; Attachment # 3).

*Id.* at 19–20.

Siwek and Nelson acknowledge that while the mid 1990 Franchise Agreement does not allow franchisees to request LCE to approve a logoed product supplier, it does not indicate that Blue Line is the only distributor to whom franchisees could turn. They argue that in post-mid 1990 contract reference to the franchisees' ability

> to turn to "previously approved" sources of supply, it refers to LCE's approval of "in accordance with its standard practice" (which arguably refers to LCE's obligations under its earlier contracts),

and thus there is a basis in the contract for concluding that LCE was committed to allow franchisees to use competitive distributors. They note further that the offering circulars did not clarify that Blue Line had an exclusive license for trademarked good nor the implications of that licensing. They also note that the offering circular indicates that the franchisees will have access to "food and non-food specifications" so they can arrange to have competitive suppliers manufacture and distribute these products. In June 1993, LCE's attorney wrote to plaintiff Smith's attorney indicating the specifications for processed foods as well as logoed paper would not be available to Gary Smith. *Id.* at 16–17, ¶ 20.

Plaintiffs' experts conclude that because the supply clauses in both

> the Pre–Mid 1990 and Post–Mid 1990 contracts suggest that a prospective franchisee would be protected from post-lock in, supra-competitive pricing of Goods and

---

**59.** The experts do not note that David Deal also testified that a new franchise offering circular was being prepared in December 1994, and that LCE did expect to be offering new franchises for sale. Deal Dep. at 308.

**60.** The August 1990 Franchise Agreement, Section XVII C.3, precludes a franchisee during and for two years following the termination of the franchise agreement from engaging in a fast food operation in market areas selling pizza, pasta, submarine sandwiches or related products similar to those sold by a Little Caesar outlet.

distribution services, the behavior of LCE/Blue Line and statements contained in Blue Line documents indicate that franchisees were not really protected absent legal action. By not fulfilling the terms of the Franchise Agreements, LCE/Blue Line was in a position to exclude third-party distributors and charge supra-competitive prices to Little Caesar franchisees. While the modification of the "supply clause" in Mid–1990 revealed a contractual tie and provided some hint of LCE's overall strategy, the fact that LCE would use the explicit tie as part of a plan to exclude rival distributors and charge supra-competitive prices was not clearly revealed to prospective franchisees. Indeed, it continues to be denied by LCE, despite comments to the contrary in its documents.

*Id.* at 18, ¶ 21 (footnotes omitted).

The experts assert that:

Once the franchisees signed the Post–Mid 1990 Franchise Agreement, they were locked into buying logoed products from Blue Line. Blue Line's control over logoed products and LCE's control over the approval of suppliers forced Plaintiffs to use Blue Line as their distributor.

*Id.* at 19, ¶ 22. They note that these behaviors of LCE/Blue Line were anticompetitive and if the Court approves this behavior,

it will be approving behavior that threatens efficient franchising.[19] Specifically, efficient franchising requires franchisees to be able to count on the sanctity of the contracts they sign before they sink time and money into their franchise operations. To allow the franchisor to use its post-lock in market power to extract higher payments from franchisees (in this case through unannounced changes in distribution policies that give an affiliate a near monopoly) would make franchising riskier for franchisees and undermine efficient franchising.

---

[19] If the Court allows LCE/Blue Line to take the rents that would have flowed to the franchisee under an appropriate interpretation of the Franchise Agreement, the Court would in essence be allowing LCE to change the rules of the game after the franchisee is locked in. This is similar to allowing merging pipelines to change the transportation costs that a "wildcatter" faces

after it chose to prospect in an area because of the competitive transportation costs in the area. In both cases, approval of an anticompetitive practice would make the investment in socially-valuable risk taking activities less attractive by making it less likely that a successful effort will be rewarded. This will chill investment in socially valuable risk-taking. Approval of LCE's use of Blue Line as the exclusive distributor has the added adverse effect of encouraging LCE to use a relatively inefficient distributor, which wastes resources.

*Id.* at 19, ¶ 23b.

Based upon the limited financial data available to the experts and AmeriServ's estimates of its competitive pricing (which is that each franchise is overcharged $165 per week per outlet), and given the 2,400 independent franchisees as of September 1993, plaintiff's experts estimate the annual overcharges would exceed $20 million per year. *Id.* at 21, ¶ 25.

The experts then go on to discuss that the alleged overcharge by LCE/Blue Line's supracompetitive pricing has an impact and causes economic damages to all of the franchises. They note that the defendant has shown no evidence that LCE has lowered its initial franchise fee and royalty fees in anticipation of and to adjust for its later charging of supracompetitive prices on goods supplied for the operation of the franchise. *Id.* at 22, ¶ 27.

Plaintiffs' experts also argue that LCE/Blue Line do not have the economies of broad scale distributors that serve multiple restaurant chains. These entities buy substantially larger quantities of food than Blue Line, and make substantially larger "drops" of food to restaurants, and do so with more efficient transportation costs because of servicing more restaurants per trip. The experts assert that in a competitive market, LCE would earn below a competitive rate of return. They argue that the franchise agreement and the presentations by LCE that the franchisees would have a right to turn to competitive sources of supply, the fact that the franchise agreement did not disclose that potential franchisees should expect to pay above-market prices for goods, as well as other evidence suggests

that LCE was using the market power it obtained through post-contract lock-in ef-

fects to force its franchisees to pay supra-competitive prices that were not required by the Franchise Agreements or envisioned at the time the Plaintiffs' Franchise Agreements were signed.

*Id.* at 24, ¶ 30.

### D. *Legal and Factual Analysis and Conclusion:*

On the present record a reasonable jury would, as a matter of law, have to find that the facts noted below were generally known, and therefore readily knowable with minimum information costs, to anyone considering signing a mid–1990 Franchise Agreement at a time after Blue Line had become the regional distributor in their area.[61]

1. Little Caesar franchises had to use logoed goods and other foodstuffs and supplies meeting LCE specifications in order to operate a Little Caesar franchise.

2. Little Caesar franchisees could only obtain logoed and other specification goods from an approved source, which in effect meant an approved distributor who obtained the logoed and other products from an approved source.

3. Franchisees are free to purchase supplies, including logoed goods, from any source that the franchisee could demonstrate provided supplies that conformed to LCE specifications.

4. The LCE Offering Circular assured franchisees that "food and non-food product specifications are maintained at LITTLE CAESAR's principal office and are available on request for examination."

5. At the time of signing the mid–1990 Franchise Agreement, the only approved distributor of logoed goods still doing business in the region was Blue Line.

6. While other approved distributors in the past had distributed logoed goods, none of them were currently in the regional marketplace nor was there any reason to assume any of them would be entering that market in the near future.

7. Blue Line Distributing, Inc. is "a wholly owned subsidiary of LITTLE CAESAR, to whom LITTLE CAESAR has granted an exclusive license to contract for the manufacture and distribution of certain supplies."

8. Blue Line "derives substantial income from the sale of supplies to Franchisees as well as to LITTLE CAESAR-owned Restaurants."

9. The audited financial statements of Blue Line are consolidated with those of LCE for recent years and are available with the Offering Circular and for 1988 show that LCE derives more than seven times the income from food service sales for operation of Little Caesar franchises than from the combined sales of new franchises and collection of royalties obtained from its existing franchises.

10. Blue Line's profits benefit LCE.

11. LCE has a copyright on its trademark and other distinctive logos and marks used in its business and on its logoed products needed to operate a Little Caesar franchise.

12. LCE can control entirely who manufactures and/or distributes products with its copyrighted logo and marks. It could limit the manufacturing and/or distribution of logoed items to a single source which could be itself or Blue Line.

13. A list of approved suppliers who provide LCE foodstuffs and other products meeting LCE specifications is available.

14. Franchisees can request an alternate supplier be placed on LCE's approved list for all items meeting LCE specifications except for secret spices and dough mixes and "products bearing the LITTLE CAESAR name and Proprietary Marks."

15. While LCE secret spice mix and dough mixes are the only products that the franchisees are expressly bound to purchase from LCE through Blue Line, Blue Line is the only source in the regional market from which franchisees can purchase logoed products, and franchisees signing the mid–1990

---

61. As noted above, those few class members who were in areas not being serviced by Blue Line at the time they considered signing a mid–1990

Franchise Agreement, the "Associate Distributor Class Members," warrant separate consideration.

Franchise Agreement had no rights under that contract to request an alternate source for those products.

16. Unless LCE approves an alternate source of logoed products on its own, or in response to a request from someone having a pre–mid–1990 Franchise Agreement, the franchisee runs the risk of having their continued right to operate a LCE franchise tied to their purchasing logoed products from LCE through its Blue Line distribution division.

17. LCE through Blue Line sets the price for logoed products and could set prices for logoed products that are higher than similar generic products.

18. Other carry out pizza franchises and other fast food franchises in which one might invest may have less restrictive provisions and fewer risks of a tie-in than the LCE franchise.

19. LCE has the legal right to charge more for logoed products through Blue Line than similar such products might cost if the potential Little Caesar investor obtained an alternative carry out food franchise.

20. The market for carry out food franchises is a competitive market for investors.

21. The retail fast food carry out markets, including the pizza carryout food market, are extremely competitive.

22. Because LCE franchises compete in a very competitive carry out food market, LCE through Blue Line is limited in the extent it could overcharge for logoed products (or any other products for which an alternative competitive distributor is not available) because either: (a) LCE could not sell new franchises on the existing terms if it became generally known that it exploited its existing franchisees; or (b) because even if it stopped selling new franchises and cared little about its reputation in the franchise sales market, it is dependent for substantial portions of its income and profits not only on royalties but more significantly on Blue Line sales profits from its franchisees, which would be lost if it charged supracompetitive prices of such a magnitude that its franchisees could not cover their marginal costs in the competitive fast-food and carryout market.

In addition to the above facts that would be generally known or knowable at minimum cost *prior* to the signing of a mid–1990 Franchise Agreement, the only change that LCE apparently implemented *after* the franchisees signed a mid–1990 Franchise Agreement was to change any policy it had not to permit alternate approved distributors to have access to logoed products. The three alternate distributors approved in 1995 were given access to logoed goods.[62] This change did not adversely affect Little Caesar class member franchisees. Each franchisee had contractual protections against excessive franchisor opportunism post-contract by raising the price of goods in the market basket because each of them had a contractual right to seek approval of a second source of supplies for any and all items except Pan!Pan! Dough, Spice Mix, and logoed products.

Thus, prior to signing a mid–1990 LCE Franchise Agreement it was either generally known or easily knowable [63] to the non-Associate Distributor class members that to operate a LCE franchise there was a risk that one would be forced to purchase logoed products from LCE through Blue Line possibly at supracompetitive prices.

If class plaintiffs were suing LCE for charging supracompetitive prices for its logoed goods, class plaintiffs would have no claim under antitrust law to a *Kodak*-type market definition even though they might have some state claims under contract law. Based on the current record this Court could

---

**62.** While LCE denies the allegation that it had a policy in the early 1990's of not approving alternate distributors to rival Blue Line, if that was the policy, then there was a second change in that policy when in 1995 it approved the three alternate distributors who applied in 1993 and 1994—PYA Monarch, Schloss and Kahn, and Gordon Food Service. Defendant notes that these three approved alternate distributors that were approved in 1995 have not entered the market to compete with Blue Line.

**63.** The LCE Offering Circular provided potential investors not only the number and location of other LCE carryout franchises, but also the names of the owners so that any prospective franchisee could contact existing franchise owners.

find as a matter of law that LCE made sufficient disclosures prior to signing a mid–1990 Franchise Agreement which, when evaluated in light of other generally known or readily available information, would put a reasonably prudent franchise purchaser on notice of the risk that logoed goods would be tied in with the franchisee having no contractual or other limitations on price. This information would be available to a prospective franchisee even though the mid–1990 Franchise Agreement does not expressly tie logoed products to the continued operation of a Little Caesar franchise. This would be known with or without knowledge of the exclusive June 1989 Licensing Agreement.[64]

64. The exclusive licensing agreement and other documents obtained during discovery would support a finding that it was LCE's intention to use its legal monopoly over its proprietary marks to improve its competitive position vis-a-vis alternate potential distributors. While a potential franchise might not know that LCE intended to use its power in this manner, they would know LCE had that power to exercise if it chose to do so.

65. In most areas of the country from mid–1990 on, Blue Line was the sole source of such items. This would be known to any franchisee who signed the mid–1990 Franchise Agreement to renew their franchise. It could also readily be determined by any potential new franchisee, who had never had a Little Caesar franchise, by either inquiring of Little Caesar during their franchise negotiations or calling any of the hundreds of franchisees listed in the Offering Circular. This is the case even though the mid–1990 Franchise Agreement does not expressly tie logoed products to the continued operation of a Little Caesar franchise.

Defendant argues in this Motion for Partial Summary Judgment that sufficient disclosures were made pre-contract to inform potential franchisees that signing the mid–1990 Franchise Agreement exposed the franchisee to a requirement that to continue as a Little Caesar's franchisee logoed products would have to be purchased from Blue Line. Plaintiffs in their Second Supplemental Brief note that defendant in its earlier efforts to defeat the plaintiffs' first motion for class certification argued that:

LCE intended that only one category of items, logoed products, be purchased only from Blue Line. (Deal Decl. ¶ 10) Although this intent was expressed in an internal document and in letters to logoed paper suppliers and third party distributors, the intent was never communicated in any uniform written or oral communication to the franchisees (Id.) The franchise agreement was amended in mid 1990 to provide that a franchisee could not request addi-

Thus, the evidence is such that no reasonable jury could conclude that it was not generally known to potential franchisees pre-contract in mid–1990 and thereafter that LCE, either directly or through Blue Line, could restrict their access to logoed goods from any source other than Blue Line.[65]

Yet, the class plaintiffs are not claiming damages for paying supracompetitive prices for logoed goods. Rather, they are claiming that the defendant used its power over its logoed goods to extend its tie-in over these goods to the entire market basket of goods necessary to operate a Little Caesar franchise for which supracompetitive prices are being charged. As noted above, this claim is

tional sources for logoed products, **but does not inform franchisees who signed the new agreement that Blue Line was the only** *existing* **source of logoed paper products** . . . . thus, a franchisee would have to be a **mind reader to have discerned that Little Caesar's intent was that logoed products be purchased only from Blue Line.**
Plaintiffs' Second Supplemental Brief in Opposition to Defendants' Motion for Partial Summary Judgment at 3, filed April 4, 1997, quoting Defendant's Brief in Opposition to Class Certification, pp. 9–10, filed July 13, 1994, Docket # 43. (Emphasis supplied by plaintiffs' counsel.) This "mind reader" argument was later repeated in oral arguments.

Defendant responds that plaintiff's lead counsel argued in the second class certification motion that

As a practical matter, most of the franchisees, generally speaking, were aware of the fact that they didn't have any options, that there was no place else to go other than Little Caesar's. Certainly up until 1995, no other distributor was ever approved, not ever, so they had to go buy all their goods—I mean, they had no place else to go.

July 22, 1996 Hearing Transcript at 45.

Plaintiffs' experts also acknowledge that "the modification of the 'supply clause' in Mid–1990 revealed a contractual tie . . ." although the use of it to exclude rival distributors was not disclosed.

While defendant's earlier adversarial arguments serving the moment may later appear inconsistent with current arguments, this Court must determine the facts and the legal implications from the facts based on the record and its best assessment of the legal interpretation that can be placed on the facts. It is not appropriate in doing so to seek to punish any past rhetorical overstatements. As my initial Report and Recommendation on Class Certification indicated, I did not accept defendant's "mind reader" argument then, nor do I feel bound by it now.

based on the assertion that denial of access to logoed goods raises the market entry level and reduces the ability to compete of potential rival distributors, both because of the higher profit margin on logoed goods and the preference of many franchisees for "one-stop shopping." Thus, according to plaintiffs' claim, LCE's denial of access to logoed goods keeps alternate distributors from competing with Blue Line in a manner similar to Kodak's denial of access to its unique repair parts kept independent service operators from competing with Kodak in providing service on Kodak machines. Resolving all disputed issues of fact in plaintiffs' favor, it must be assumed (as plaintiffs' expert contend and AmeriServ's Burgess stated) that a rival distributor could not enter the market and compete successfully without access to logoed goods.[66]

On the current record, it cannot be said as a matter of law that a potential franchisee in mid–1990, even an existing franchisee, would know or could reasonably anticipate that a rival distributor would be unable to enter the market and compete with Blue Line in the absence of having access to logoed products.

Thus, the record is such that there is a disputed issue of material fact as to whether any potential franchisee considering signing a mid–1990 Franchise Agreement could anticipate that the lack of access to logoed products would preclude alternate distributors from entering the market to compete with Blue Line. Each franchisee had contractual protections against excessive franchisor opportunism post-contract by raising the price of goods in the market basket because each of them had a contractual right to seek approval of a second source of supplies for any and all items except Pan!Pan! Dough, Spice Mix, and logoed products. (Franchise Agreement Section VII.) Thus, on the pres-

ent record, and for purposes of considering whether a *Kodak*-type market definition is applicable, there is an unresolved factual question concerning whether a potential franchisee could anticipate that its contract protections in Section VII of the Franchise Agreement to obtain a second source was effectively undermined by its relinquishing of a right to seek a second source for logoed products. Unlike *Kodak* and *PSI*, where it would be *obvious* that an independent service provider could not compete with service being provided by the original equipment manufacturer if the independent service provider did not have access to replacement parts, it is *not obvious* that an alternate distributor cannot compete with Blue Line without access to logoed goods.[67] Not only is it not obvious, but defendant contends that it is not even true. Thus, under *Kodak* and *PSI*, there is a potential that the franchisor could take advantage of the franchisees' ignorance on this non-obvious fact by implementing an unanticipated change of policy to preclude rival distributors from entering the market by denying them access to logoed products after franchisees had signed their mid–1990 Franchise Agreement and become "locked in."

Defendant notes that the three 1993–1994 alternate distributor applications that were approved in 1995 were given access to logoed products. In addition, the newest form Franchise Agreement again allows a franchisee to seek an alternate source of logoed products. Yet, notwithstanding this, the facts are such that a reasonable jury could conclude that from mid–1990 until at least the filing of this lawsuit LCE/Blue Line had a policy that would deny access to logoed products to alternate distributors, similar to the policy it implemented against PYA Monarch when Blue Line entered the Atlanta area in 1989.

66. This issue is disputed by the defendant that contends AmeriServ was willing to enter the distribution market without logoed goods. Defendant also contends that the number of franchisees in each distribution area are insufficient to make it economically feasible for there to be more than one distributor. Again, for purposes of this motion it will be assumed that if approved and provided access to logoed goods, a rival distributor could enter the market in each region

or in some other geographical market combining or modifying existing distribution regions.

67. Obviously at some level of supracompetitive pricing a rival distributor could enter the market and compete without logoed goods because it could "beat" the blended margin overcharges of Blue Line on the market basket of goods, and the preference of franchisees for "one stop" shopping will fade if it becomes too expensive.

The fact that LCE had such a policy during the relevant time periods is not all that is necessary to resolve the question of whether plaintiffs are eligible for a *Kodak*-type market definition. The caveat expressed in *PSI* noted:

> If there were any evidence in the record that [the defendant] took advantage of its customers' imperfect information in order to reap supracompetitive profits in the aftermarket for [its product], we would not hesitate to allow a *Kodak*-type theory to be submitted to the jury.

104 F.3d. at 821. *PSI* then stated that it could not find evidence that the defendant "engaged in such activities. In this situation a *Kodak*-type theory is not applicable." *Id.*

Thus, the critical question in the present case is whether LCE "engaged in such activities." Is there sufficient evidence in the record from which a reasonable fact-finder could conclude that during the relevant time periods LCE implemented this policy to exclude any potential alternate distributor from the market? During the relevant time period, only AmeriServ in the southeast (and possibly nationwide) and Chopping Block in Wisconsin sought to become alternate distributors. Yet, both did not become alternate distributors because LCE did not approve them. With respect to the denial of approval to Chopping Block, plaintiffs do not appear to contest the legitimacy of LCE's reasons for denial that Chopping Block did not offer a full line of products to Little Caesar franchisees. Plaintiffs do assert that the withholding of approval of AmeriServ was wrongfully undertaken to exclude competition. The issue of whether this was or was not a wrongful withholding of permission will be resolved in Gary Smith's individual case.

As noted above, the class certification deals with whether LCE violated antitrust laws by tying in its logoed paper products or by extending that tie to the entire market basket of goods needed to operate a Little Caesar franchise. There is no evidence that Chopping Block did not enter the market because of lack of access to logoed products. There is no evidence that Chopping Block even wanted to sell logoed products. There is evidence that had LCE approved AmeriServ, it did intend to deny them access to logoed goods. Yet this never occurred because the denial of AmeriServ was done for other reasons. Thus, as a matter of law, this Court can determine that no reasonable jury could find that AmeriServ did not become an alternate distributor in the southeast United States or other places because of its lack of access to logoed goods. While this situation *might have occurred* had AmeriServ been approved by LCE, and while such an action might be an antitrust violation because in such a hypothetical case the plaintiffs could make a viable claim to a *Kodak*-type tying market, the reality is that this hypothetical possibility (or probability) did not occur.

While the present case does involve information and switching costs of sufficient magnitude to warrant invocation of a *Kodak*-type market definition if the defendant took advantage of the franchisees' ignorance, the evidence does not show that during the limitations period for this lawsuit the defendant used its restrictive policy on the availability of logoed goods to alternate distributors to *exclude* any potential distributor from the market. Nor during the limitations period has any potential alternate distributor been *precluded from entering* the market to compete with Blue Line because of LCE's restriction on the availability of logoed goods.

While plaintiffs' economic experts assert that there is a need for logoed goods in order to enter the market and compete with Blue Line, the above analysis assumes, for purposes of this motion, that plaintiffs will prevail on this factual dispute. Yet, the economic experts do not point to any evidence of what occurred in the marketplace to put factual flesh on the bones of their economic theory. During the relevant time periods for the class, there is no proof that LCE's exercise of its power to deny access to logoed goods to an alternative distributor prevented *any* distributor from entering the market or remaining in the market. Nor is there evidence any potential rival to Blue Line failed to seek approval because of this LCE policy. One thing that *Kodak* stressed was that courts should look to the "market realities" and "particular facts disclosed by the record"

and not depend solely on the theories of economists. To do so would allow juries to substitute their speculations for the evidence necessary to make out a *Kodak*-type showing of power in the tying market.

Resolving all facts in plaintiffs' favor, even if this Court assumed that LCE fully intended to deny AmeriServ access to logoed goods if they approved them, and assuming further that LCE fully intended to violate the antitrust laws in doing this, these intentions never materialized because AmeriServ was never granted approval to be an alternate distributor. Thus, LCE never got to the point where it implemented its "wrongful" plan concerning denial of access to logoed goods.[68] Nor is there any evidence that LCE's denial of access to logoed goods to alternate distributors actually contributed to any alternative distributors during the statute of limitations period for this litigation: (1) having to leave the market; (2) not being able to enter the market, or (3) being dissuaded from applying to be an alternate distributor.[69] Thus, on the present record, no reasonable jury could find that during the limitations period LCE used its power to deny access to logoed goods to alternate distributors to handicap or exclude any rival distributors. Thus, this Court can determine as a matter of law that plaintiffs have not made a sufficient showing from which a reasonable fact-finder could conclude that class plaintiffs are entitled to a *Kodak*-type market definition because of defendant implementing a change in policy to the detriment of "locked in" franchisees.

With respect to the Associate Distributor Class Members who had a distributor other than Blue Line in their region when they signed the mid–1990 Franchise Agreement, these class members may not have had sufficient knowledge prior to signing the mid–1990 Franchise Agreement to know that they would later be "tied in" to Blue Line as the sole distributor of logoed goods. At the time of their signing of the Franchise Agreement, they would have had a distributor of logoed goods other than Blue Line. Yet, as with the majority of the class, the critical question is whether LCE "engaged in ... activities" taking advantage of the Associate Distributor Class Members' imperfect information. The associate distributors who ceased serving as distributors after LCE began using its mid–1990 Franchise Agreement were Pegler Sysco in the Kansas City area in 1990, Leprino Foods in California in 1991, and Food Services of America in Washington state in 1992.

There is no evidence in the record that Pegler Sysco sought to continue competing with Blue Line, nor that it sought but could not obtain logoed goods. While the evidence is such that a jury could find that Pegler Sysco, *if it had asked,* would have been denied continued access to logoed goods once Blue Line/Dallas began to distribute goods in the Kansas City area, that is not sufficient evidence to support a jury finding that Pegler Sysco was driven from the Kansas City market by LCE's restrictive policy concerning logoed goods. Similarly, there is no evidence that Leprino Foods or Food Services of America were forced to exit the Little Caesar distribution market because of lack of access to logoed goods. Thus, there is not sufficient evidence in the record from which these Associate Distributor Class Members could claim a *Kodak*-type market for the tying product.

Plaintiffs argue that *Collins v. International Dairy Queen,* 939 F.Supp. 875 (M.D.Ga.1996), rejected summary judgment arguments similar to those of defendant LCE both on the market definition issue as well as the sufficiency of the evidence of coercion on the tie-in claim. As in the present case, *Collins* is a franchise case involving the franchisor approval of products and supplies used in Dairy Queen franchise outlets to maintain the reputation for quality of Dairy Queen products. The district court acknowl-

---

**68.** As noted above, any other possible "wrongful plan" of illegally denying approval to a qualified alternative distributor will be litigated in Gary Smith's individual case.

**69.** While Burgess says that he could not compete without access to logoed goods, plaintiffs have submitted no evidence that any other distributors in the United States were dissuaded from seeking to become a competitor of Blue Line because of their awareness of this policy of LCE denying them access to logoed goods.

edged that "an approved source requirement can constitute an illegal tie if a franchisee is coerced into buying products from a company in which a franchisor has a financial interest." 939 F.Supp. at 881 (quoting *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 712 (11th Cir.1984)).

Dairy Queen made substantial profits by selling equipment, produce and supplies which they purchased for resale to authorized warehouses which paid Dairy Queen a commission and resold the items to franchisees. Dairy Queen also sold certain items directly to franchisees including its soft-serve ice cream mix. Dairy Queen received a fee of a half percent on all warehouse sales whether the warehouse obtained the items from Dairy Queen or from a manufacturer that met Dairy Queen specifications. The Dairy Queen Operators' Cooperative ("DQOC") had designated certain manufacturers who produced products meeting Dairy Queen's specifications. Dairy Queen also received a commission even when the warehouse bought these products directly from the DQOC-endorsed manufacturers rather than from Dairy Queen. DQOC also sought to operate as a purchasing cooperative for franchisees. *Id.* at 881.

While the franchise agreement required that the "Franchisor [is] to consider requests of Licensee for approval of specific alternate sources of supply and to cooperate with Licensee in this regard," plaintiffs alleged that Dairy Queen routinely delayed and frustrated efforts to have alternate suppliers approved and refused to recognize DQOC as the agent of the franchisees and had refused to consider DQOC's requests for approval of alternate suppliers. *Id.* at 881.

The district court in *Collins* denied summary judgment for defendant. First, it rejected defendant's argument that "an illegal tying arrangement cannot exist as a matter of law between a franchisor and its existing franchisees." *Id.* at 883. Second, it rejected defendants' arguments that the relevant tying market is the pre-contract market for all fast-food sandwich franchises, of which Dairy Queen constituted less that 3% of that market. *Id.* at 878. It did this using traditional market definition analysis and concluded that

a jury could determine that relevant tying market was "the market for soft-serve ice cream franchises" of which Diary Queen controlled over 90%. *Id.* at 879. The court also found that a "lock-in" could be found on the existing facts, but its analysis of this issue is a single paragraph. *Id.* at 883. The case also provided a greater number of incidents of the defendant taking steps to frustrate efforts to have alternate suppliers approved than have been shown in the present case.

Thus, while agreeing with the *Collins* court that an illegal tying arrangement can in certain circumstances be found in the franchisor-franchisee relation, this Court is facing a different fact situation where LCE does not have a 90% share of the potentially relevant tying market. The *Collins* court's brief analysis of lock-in is less significant than the *PSI/Kodak* analysis needed in this case where an intermediate tied product (logoed goods) is allegedly being used to extend the tie to the entire market basket of goods needed to operate a Little Caesar franchise.

Another recent franchise case dealing more extensively with a *Kodak*-type market definition is *Wilson v. Mobil Oil Corp.*, 984 F.Supp. 450 (E.D.La.1997), involving the franchisees of SpeeDee Oil Change Systems, Inc. ("SpeeDee"). During one period of time the franchise agreement noted that Castrol was the exclusive lubricant supplier for all SpeeDee outlets. The franchise agreement required the franchisee to use only approved brand named items in their outlets. In June of 1988, SpeeDee and Mobil entered into a contract whereby Mobil became the approved supplier. The new franchise agreement indicated this and again reiterated the requirement that the franchisees use only approved brand name items, including lubricants. 984 F.Supp. at 454. At the time of the litigation, Mobil was the only company meeting SpeeDee's standards which included certain advertising contributions and equipment financing arrangements for the franchise outlets.

The defense filed a motion for summary judgment arguing that the tying market was the market for all franchises for which operation does not require specialized knowledge, and the initial investment is comparable of

that of the SpeeDee franchise. While plaintiffs had initially argued that the defendants' market power was based in its "statutory trademarks, trade names, and copyrights which possess economic distinctiveness," the Court noted that plaintiffs had "apparently abandoned these contentions, now asserting in their opposition to Mobil's summary judgment motion that the relevant market is limited to the SpeeDee franchise network." The district court noted that other courts and commentators had urged that the *Kodak*-type narrowed market definition be utilized only when there has been a unilateral change in policy by the defendants. *Id.* at 458. The *Wilson* court concluded that the franchisees had not made out a *Kodak*-type showing and

defendants' market power should be measured at the precontract stage because each plaintiff had sufficient information to evaluate the SpeeDee franchise opportunity before they "locked-in" to the franchise. Before signing their contracts, each potential franchisee knew that the franchise agreement was for fifteen years, there was a single approved brand of lubricants, that SpeeDee, not the franchisees, had the contractual authority to determine the number and identity of approved brands and/or suppliers, including lubricant brands and/or suppliers, and that if a franchisee chose to take advantage of equipment programs offered by the approved lubricant suppliers (Castrol and later Mobil), the franchisee must purchase certain amount of product from the approved suppliers. Thus, franchisees had sufficient information to conclude that they would be required to purchase from a single lubricant supplier indefinitely, that there was a possibility that SpeeDee's choice of supplier might differ from their own preferred choice, and that to take advantage of certain equipment packages, the franchisee would be required to buy specific volumes of lubricants each year from the approved suppliers.

*Id.* at 460–61, 112 S.Ct. 2072.

Plaintiffs also complained about the lack of disclosures concerning current and future prices, but the Court rejected these arguments noting that:

[A]t the precontract stage, these plaintiffs were aware that prices for lubricants would vary, that the selection of the supplier was not theirs, and that if they accepted the equipment package they would be required to purchase specific volumes of lubricants from the designated supplier. These plaintiffs had sufficient information to determine whether this franchise opportunity was too risky to venture into and to compare it with other franchises. In addition, compared to a copier purchaser who is only buying one piece of equipment, a person about to venture long-term into a new business should have a strong incentive to shop around and to determine if he needs more information to make a decision. . . . Plaintiffs have not shown any evidence that information about Mobil's products or current prices was not available from other sources. . . . These plaintiffs have suggested no reasons why they could not have contacted Mobil, existing franchisees, or market sources about the pricing and desirability of Mobil's package. The offer circulars even listed names and addresses of other SpeeDee franchisees.

*Id.*

The *Wilson* analysis of *Kodak*-type definition is more detailed than that of *Collins* and supports a finding that class plaintiffs have no *per se* tying claim with respect to the logoed goods. Neither *Collins* nor *Wilson*, both of which involved a direct alleged tie-in, are of much help to this Court in analyzing the alleged two-step tie of using the tie over logoed goods to tie in the entire market basket of goods. Neither case suggests that the above analysis on that issue is flawed.

Thus, on the present record, class plaintiffs cannot use a *Kodak*-type analysis to define the relevant tying market as the continued operation of a Little Caesar franchise. Rather, the relevant tying market is no smaller than the pre-contract market for pizza or other fast-food carry out restaurants.

Given the fact that plaintiffs have not countered defendant's assertion that LCE lacks sufficient market share in the pre-contract market for pizza or fast food franchises to trigger a *per se* tying claim, and given the fact that the plaintiffs have failed to provide

sufficient alternate evidence of market power (*see* n. 10 above), defendant should be granted summary judgment on the class tying claim because plaintiffs cannot prove *prima facie* element # 2 of its *per se* tying claim—that defendant has sufficient market power over the tying product to restrain appreciably competition in the tied product market.

Because defendant is entitled to summary judgment against all class plaintiffs based on this market power argument, this Court need not address the alternate arguments made by defendant in its motion.

## VI. RECOMMENDATION:

For the reasons stated above, IT IS RECOMMENDED that defendant's Motion for Partial Summary Judgment be DENIED on the issue of there being one product and not two, and that defendant's motion be GRANTED on the issue that plaintiffs have insufficient proof of market power in the tying product market.

Any objections to this Report and Recommendation must be filed on or before May 11, 1998. 28 U.S.C. § 636(b)(1); E.D. Mich. LR 72.1(d)(2). Failure to file objections within the specified time constitutes waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Ivey v. Wilson,* 832 F.2d 950, 957–58 (6th Cir.1987); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

On or before June 1, 1998, the opposing party may file a response to any objecting party's timely filed objections. The response shall address specifically, and in the same order raised, each issue contained within the objections.

March 31, 1998.